312 So.2d 96

**Rayford Hodge LACKEY, Sr.**

v.

**STATE.**

8 Div. 633.

Court of Criminal Appeals of Alabama.

April 22, 1975.

John F. Proctor, Scottsboro, for appellant.

William J. Baxley, Atty. Gen., and David W. Clark, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was convicted of murder in the second degree and sentenced to thirty years imprisonment in the penitentiary. Prior to arraignment he was found to be indigent and counsel was appointed to represent him. He pleaded not guilty. After conviction he sought and obtained a free transcript and trial counsel was appointed to represent him on appeal. At the time sentence was imposed he elected to take a "working appeal".

Appellant's thirteen-year-old daughter had been dating the deceased rather steadily. The deceased was nineteen years of age when appellant shot and killed him on the afternoon of March 18, 1974, with a .22 caliber rifle. Appellant objected to the relationship that existed between his daughter and the deceased. The daughter had spent several nights in the home of the deceased. It is not too unkind to say that the thirteen-year-old girl demonstrated a degree of waywardness in her association with the deceased. This association became so notorious that the Welfare Department was forced to intervene and place her in a detention facility for a period of time. She was then placed in a foster home. Prior to the date of the killing she had been permitted to return to the home of her mother who had been separated from appellant for six or seven years. There were five brothers and sisters of the thirteen-year-old girl living with the mother on the date of the homicide. All of the children of school age rode a school bus to a public school in the community.

On March 18, 1974, the thirteen-year-old girl was riding the school bus back to her home in the Section Community of Jackson County a short distance from the New Caanan Church. The time was 3:30 P.M. As the school bus passed the New Caanan Cemetery she saw the deceased, his brother and another man walking along the highway. When she got home she asked her mother to go with her and the other children to the New Caanan Church yard to play. The mother started with the children but changed her mind and returned home to prepare supper. The thirteen-year-old girl and the other children continued walking toward the church. They met the deceased, his brother and the other man near the church. They told her their car ran out of gas and they were on their way to get another car. The brother of the deceased and the other man continued on their jouney. The deceased and the girl sat on the grass by the public road to talk. According to the testimony she was wearing pink pants and she was afraid they might get grass stains on them. The deceased placed his army coat on the ground for them to sit on. Her four-year-old brother sat between them. The other children were playing in a field nearby.

The girl further testified that she and the deceased had been talking about fifteen

minutes when her father, the appellant, drove by them. He stopped and backed up and got out of the car and reached in the backseat and got a gun.

From the record:

"Q. What did he do next?

"A. He took the gun and walked over towards us, and I was holding my little brother; and I think he said, 'I told you to leave my daughter alone'.

"Q. He said this to who, now?

"A. Larry.

"Q. He said, 'I told you to leave my daughter alone'?

"A. Yes.

"Q. What, if anything, was said or done next?

"A. Larry said, 'I am not bothering her.'

"Q. Larry said, 'I am not bothering her'?

"A. Yes.

"Q. What, if anything, happened next?

"A. Larry said, 'I am not bothering her.'

"Q. And then, what happened?

"A. Larry said, 'My car ran out of gas, and my brother and another boy are going to get some or something, and I am waiting for them'; and he said, daddy said, 'Yeah, I bet'. I said, 'Don't worry, Larry, he won't hurt you.' And Daddy said, 'I won't', and shot him.

"Q. And where was the Collins boy when your daddy shot him?

"A. He was sitting down on the ground.

"Q. Where did he shoot him?

"A. What?

"Q. Where did he shoot him, if you know?

"A. Somewhere around in here.

"Q. And the Collins boy was sitting on the ground?

"A. Yes.

"Q. He didn't have his hands in his pocket, did he?

"A. No."

The girl further testified that after her father shot the deceased he walked to the car, put the gun in the car and drove off very fast; that she ran in the field and told one of her brothers what had happened and to go to the house and call an ambulance. She did not see her father any more that day.

On cross-examination she admitted that because of her relationship with the deceased she was committed to the juvenile detention home, but that she was back home living with her mother and going to school.

Appellant's wife testified for the state after the trial judge told her she could not be made to testify against her husband; that she had a privilege to testify or not to testify, and she said, "I am willing to testify."

The wife testified that on March 18, 1974, she was living right near the New Caanan Church and that around 5:00 or 5:30 P.M. appellant drove his car into the yard of her house. He got out of the car with a .22 automatic rifle. She was standing in the door watching the children coming back from the church; that when she saw her husband with the rifle in his hand she locked the door and ran out of the house and hid in the bushes. She heard him beating on the door with the gun and was calling her to let him in the house. She stayed in her hiding place and watched her husband get back in his car with the rifle and drive away. She did not see him again for a long time.

On cross-examination she admitted that her daughter had spent the night at the

home of the deceased on several occasions and that she did not want her over there; that she and her husband had gone to that house to get her and carry her home but she would not stay away from the home of the deceased; that because of her association with the deceased the juvenile authorities placed her in a detention home for a period of time.

An autopsy was performed on the body of the deceased at the Rainsville Funeral Home by Mr. Van Pruitt, Assistant State Toxicologist in charge of the Huntsville Division of the Department of Toxicology and Criminal Investigation, at the request of and in the presence of the coroner of Jackson County. He described his findings as follows:

"After making notes of the external body, then proceeded to examine the body internally, the thoracic cavity, primarily, which would be upper chest level cavity. I found that the wound which I have described as being in the somewhat back of the left shoulder was traced into the left pleura or left chest cavity. There was a path of tissue destruction leading into the left pleura cavity, passing through the second rib, the upper lobe of the left lung; it passed through the mediastinum, which is the tissue inside the chest in the midline area. There was a perforation of the left carotid artery and aorta, which is a main artery coming off the top of the heart. The path was then traced through the upper lobe of the right lung and into the lateral right chest wall, which would be the side of the right chest wall, where the path perpetrated (sic) between the third and fourth ribs, at which point I recovered a lead slug or what is commonly referred to as a lead bullet."

He further testified that the cause of death was the severing of two major arteries in the chest, resulting in massive hemorrhage as a result of a gunshot wound as above described.

Several deputy sheriffs came to the scene of the shooting and found the deceased lying on the ground near the New Caanan Church yard out in the open and near a blacktop road. He was dead when the officers arrived. Photographs were taken of the body and the scene before the body was carried to the funeral home. At the funeral home more photographs were taken showing the entrance wound. A spent hull from a .22 caliber bullet was found at the scene and preserved for evidence. The photographs were admitted in evidence over objections of appellant. The spent hull was introduced in evidence without objection. The thirteen-year-old girl told the officers that her father shot and killed the boy.

After leaving the home of appellant's wife, appellant drove to a grocery store at Duncan's Crossroads operated by a Mrs. Wooten. According to the testimony of Mrs. Wooten, appellant walked in the store and sat on the counter and he appeared to be nervous. After being in the store five to ten minutes, the officers came by the store and Mrs. Wooten asked appellant why the police were going toward New Caanan and appellant said they were hunting him. She asked him what he had done, and he said he was just protecting his family, nothing serious. Appellant did not tell her he had shot the boy and did not ask her to call an ambulance.

Appellant left the store and went to the home of Mr. Aubrey Phillips, a minister at the New Sardis Missionary, who lived in a house behind the Wooten store. Appellant told the minister that he had a problem and wanted to talk to him. They left the house and got in appellant's car and appellant said, "Well, I shot a man and I want you to call the law." The minister called the law and the officers came and arrested appellant for murder. The officers "patted" appellant down and removed from his pocket four unspent .22 caliber bullets. He was carried to jail where he was given the *Miranda* rights and warnings and appellant

gave the officers a statement. There was no attempt to introduce this statement in evidence. The four unspent bullets removed from the person of appellant were introduced in evidence over appellant's objections that the officers did not have a search warrant.

With respect to the introduction of the four cartridges taken from the person of appellant, the record reflects the following:

"Would the court reporter note the fact that the following transpired in open court in the presence of the District Attorney and his assistant, and in the presence of the attorneys for the defendant, Honorable Robert S. Thomas and Honorable John S. Proctor. Gentlemen, earlier in the trial of this case, Officer Goolsby, (sic) who is an employee of the Sheriff's Department of the Jackson County Sheriff, was allowed to testify without objection that he had searched the defendant and took some .22 caliber cartridges from his person and delivered those cartridges to Officer Max Robertson. There was no testimony, either direct or on cross examination as to whether the search by Officer Goolesby took place with or without a warrant or under circumstances as would denote whether such was or was not reasonable. Thereafter, when Officer Robertson testified that Officer identified some cartridges, that he stated had been delivered to him by Officer Goolesby, and the cartridges were offered in evidence by the State, at which time the defendant objected on the grounds it was not shown the search of the defendant was reasonable or lawful; and the Court thereupon offered the defendant an opportunity to offer testimony on the question of the search and of the suppression of the fruits of the search; and the defendant, as the Court understands it, declined to do so. The Court now states to Counsel for the defendant that if the defendant wishes to make inquiry outside the presence or hearing of the jury on the question of reasonableness, vel non of the search, or whether the search took place under a search warrant or any and all other circumstances, that attendant to the alleged search of the defendant, they will be given a full and fair opportunity to do so at this time.

"MR. PROCTOR: Judge, we understand we were given that opportunity, but our position remains that the burden is on the State to show that the search was reasonable and lawful; and so they have not done so. So if they want to take the burden, they can; so we don't care to offer any testimony whatever.

"THE COURT: You don't care to offer any testimony whatever?

"MR. PROCTOR: No, sir.

"THE COURT: All right, let's proceed. Have the jury come back."

Appellant testified in his behalf and according to his testimony he was living in Scottsboro on March 18, 1974; that he had been separated from his wife six or seven years. On this date he was driving his car with a .22 rifle in the back seat. He was on his way to visit his wife and as he passed the New Caanan Church he saw his thirteen-year-old daughter and the deceased on the edge of the road; that she was lying on the ground and he was on top of her. He drove past them some thirty or forty feet and he recognized his daughter when she jumped up. He stopped his car and backed up beside them. At this point his daughter was sitting up holding his four-year-old son. There was a man's coat on the ground where he first saw the deceased on top of his daughter; that he reached in the backseat and got his rifle and walked over to where they were sitting. He told the deceased that he was too old to be going with his daughter, and for him to stay away from her; that he had told him on more than one occasion to stay away from her but he

would not leave her alone. He said the deceased mentioned something about running out of gas; that the deceased had his left hand on the ground and started reaching for his right pocket; that the deceased didn't get up but "he seemed like he was going to turn over towards me", and he shot the deceased; that when the deceased started to reach for his right pocket he cursed and threatened him. Appellant was asked to tell the jury what the deceased said and he replied, "I would rather not repeat the language he used in a mixed crowd." He further testified that his daughter went to the house of the deceased against his wishes and also the wishes of her mother. He said her relationship with the deceased resulted in her being placed in the juvenile detention home for a period of time.

On cross-examination he testified that after he left his wife's home, he drank a pint of whiskey and threw the bottle away before he got to the Wooten store. He could not recall what he did with his rifle. He said the place where he shot the deceased was open and in plain view of a public road. He did not see either his daughter or the deceased with any of their clothing off. They were not behind any bushes, rocks or other objects of any nature; that he did not see a knife or other weapon in the hands of the deceased and that the deceased didn't hit at him or anything like that.

Appellant introduced a number of character witnesses who testified to his good reputation and his reputation for peace and quietude. One witness testified that the deceased had a bad reputation in the community.

On rebuttal the mother of the deceased testified that she collected his personal effects from the funeral home and they consisted only of a billfold and a ring.

 In Daniels v. State, 290 Ala. 316, 276 So.2d 441, Justice Bloodworth, writing for a unanimous court, set forth six exceptions under which warrantless searches have been upheld. These are:

1. In "plain view";

2. With "consent" voluntarily, intelligently and knowingly given;

3. As "incident to a lawful arrest";

4. In "hot pursuit" or "emergency" situations;

5. Where "exigent circumstances" exist coincidental with "probable cause" (as in case of movables); and

6. In "stop and frisk" situations.

There can be no question but that the arresting officer had "probable cause" to arrest appellant and charge him with the murder of a defenseless nineteen-year-old youth. He was informed by appellant's thirteen-year-old daughter that she was an eye witness to the shooting. She further said that the deceased did not have his hand in his pocket when her father shot him while he was sitting on the ground.

 The search of appellant's person in this case, without a search warrant, was more than justified as being incident to a lawful arrest based upon probable cause that a murder had been committed. The arresting officer had a right to search for weapons which could have put the arresting officer in danger of his life or safety. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685; Ex parte Hurn, 92 Ala. 102, 9 So. 515.

 Evidence obtained as a result of a search conducted incident to a lawful arrest was properly admitted in evidence. Sellers v. State, 48 Ala.App. 178, 263 So.2d 156; Muller v. State, 44 Ala.App. 637, 218 So.2d 698; Martin v. United States, 5 Cir., 301 F.2d 81; Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668; Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed. 327; Thomas v. State, 50 Ala.App. 227, 278 So.2d 230.

Where evidence is seized from a person who has been lawfully arrested for a criminal offense by one officer and the evidence is immediately given to another officer who kept the evidence in his custody until produced at the trial of the accused proper continuity of possession and identification is established and the evidence was admissible at the trial of the defendant. Stated another way, there was no missing link in the chain of possession. Powell v. State, 47 Ala.App. 582, 258 So.2d 923; Pitts v. State, 291 Ala. 136, 279 So.2d 119; Green v. State, 42 Ala.App. 439, 167 So.2d 694; Dennison v. State, 259 Ala. 424, 66 So.2d 552.

There was no error in the admission of the photographs in evidence. The rule is stated in McKee v. State, 253 Ala. 235, 44 So.2d 781, as follows:

"* * * [T]he art of photography is generally relied on for depicting the resemblance of persons, objects, things and places and when verified by evidence, extrinsic of the photographs, going to show that they correctly depict the thing or object *at the time they were taken*, photographs are admissible in evidence in a criminal prosecution, if they tend to shed light on, strengthen or illustrate the truth of other testimony offered by the prosecution. * * *" (Emphasis supplied).

For a collection of cases on this proposition see Ala.Dig. Criminal Law, ⊙ 438(4).

There was no motion to exclude the state's evidence; there was no request for the affirmative charge (or any charges); and there were no exceptions reserved to the oral charge of the court. There was a motion for a new trial filed which was overruled and denied.

This was a senseless killing of an unarmed young man. If the deceased was having sexual relations with appellant's thirteen-year-old daughter, he was guilty of carnal knowledge for which there was no defense. He should have been prosecuted for whatever crimes he might have committed with the girl.

We find no error to reverse and the judgment of conviction is affirmed.

Affirmed.

TYSON, DeCARLO and BOOKOUT, JJ., concur.

CATES, P. J., concurs in the result.