The appellant was indicted and convicted for the murder of his wife, Florence Thomas Shorts, by stabbing her with a knife in violation of Alabama Code § 13A-6-2 (Supp. 1977). The trial court fixed his punishment at life in the state penitentiary. *Page 832 
At arraignment, in the presence of counsel, appellant pleaded not guilty and not guilty by reason of insanity. Appellant is represented on this appeal by court-appointed counsel, who represented him at trial, and has been furnished with a free transcript.
The evidence was uncontroverted that appellant murdered his wife by stabbing her some forty times with a knife. From the opening statement at appellant's trial, it was freely admitted that appellant, acting alone, made all the stab wounds. The only defense offered was insanity.
Appellant, without reservations, admitted in his testimony that he was mad at his wife at the time he killed her. Appellant testified that he and the deceased "wasn't getting along too good," that she had been "going out sleeping with other men" and was pregnant with a child that was not his. One paramour the deceased had mentioned in particular was a "guy named Charles," whom she had been seeing for "about a week" prior to the night she was killed. Appellant stated that he "got tired" of the deceased referring to Charles as "her sweetheart." It was appellant's belief that the deceased and Charles "both put a hoodoo pact on me." Appellant further testified that the deceased had told him that "Charles and his mama put the hoodoo on me."
The night of the killing appellant testified that he had been trying to go to sleep but the deceased wouldn't let him. The deceased was "just laying there wide awake calling Charles's name and doing things." "I told her she gonna keep on, I do something to her." The deceased then told appellant she wanted to engage in marital relations, but appellant found himself impotent. The deceased began laughing "about putting the hoodoo on me" and "that's when I killed her." Appellant testified that if the deceased "hadn't messed around" with Charles the "hoodoo" would never have "got on me." He further stated that if one had enough "hoodoo" it would "kill you, that's what it will do for you." Appellant expressed no regret for having killed the deceased.
During the course of the trial, there was a great deal of testimony concerning appellant's mental condition. Evidence was presented by Dr. Thomas L. Smith, Jr., a psychiatrist and Director of the Alabama Secure Medical Facility at Bryce Hospital, on behalf of the State and by Dr. J. Stephen Zeigler, a clinical psychologist, on behalf of the defense as to appellant's sanity at the time of the commission of the crime.
Dr. Smith gave his opinion that, even though appellant "may have had a mental disease or defect at the time of the act charged, such disease or defect did not in his case cause the defendant to lack substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law." Dr. Smith was able to observe appellant at Bryce Hospital after the February, 1980, killing from 8-1-80 to 10-3-80 and from 12-23-80 to 4-15-81. Dr. Smith testified that appellant's I.Q. was tested while he was at Bryce and that appellant scored a full scale of 55, placing him in the mild range of mental retardation.
Dr. Zeigler's testimony concerning appellant's mental condition, on the other hand, was based on his examination of appellant for "several hours" on November 9, 1979, three months prior to the commission of the offense. At that time Dr. Zeigler had been requested by the State Department of Education, the Division of Disability Determination, to determine whether or not appellant could handle his own financial affairs. He had no further contact with appellant. Dr. Zeigler testified that his conclusion about appellant's mental condition was contrary to those of Bryce Hospital.
Without further detailing the testimonies of Dr. Smith and Dr. Zeigler, it is sufficient to say there was a conflict in the evidence. It is clear from reading the record, however, that Dr. Zeigler's testimony in no manner constituted a "preponderance of the evidence" that appellant was suffering from a "mental disease or defect" at the time of the commission of the crime such as would negate criminal responsibility under Alabama Code § 13A-3-1 (Supp. 1977). In *Page 833 
order to overcome the presumption of sanity, the appellant had the burden to prove by a preponderance of the evidence that he was, in fact, not responsible for his criminal conduct because at the time of such conduct he lacked the "substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law" as a result of a mental disease or defect. Alabama Code § 13A-3-1 (Supp. 1977). SeeChristian v. State, 351 So.2d 623 (Ala. 1977); Wherry v. State,402 So.2d 1130 (Ala.Cr.App. 1981); Berard v. State,402 So.2d 1044 (Ala.Cr.App. 1980). The determination of that issue against appellant was clearly within the province of the jury and was fully supported by the State's evidence. We note that Alabama Code § 15-16-2 (1975) was not repealed by § 9901 of Acts 1977, No. 607, and should be read in conjunction with Alabama Code § 13A-3-3 (Supp. 1977).
Appellant contends it was error for the trial court to allow his tape recorded confession to be played before the jury. Appellant maintains that he did not have the mental capability to knowingly and intelligently waive his constitutional rights at the time he was given the Miranda warnings at the Gadsden Police Department. We disagree.
The record is clear that, before appellant was questioned regarding his confession, law enforcement officers read him theMiranda warnings and he voluntarily signed a waiver. The question in issue is whether or not, under the totality of the circumstances, appellant had the mental capability of understanding the Miranda warnings and of knowingly and intelligently waiving his constitutional rights. We answer affirmatively.
Lieutenant H.J. Copeland of the Gadsden Police Department testified, outside the presence of the jury, that in reading to appellant the Miranda warnings, "I explained to him that those were his rights. . . . I asked him did he understand them and he said, `Yes.'"
"Q. What was said next?
 "A. All right. I asked him did he want to sign it. I explained to him what that was, it was a waiver agreeing to talk to me.
"Q. Tell us exactly what you explained to him.
 "A. I told him — Explained to him what that was, told him it was a waiver. If he signed it that meant he agreed to talk to me without an attorney and did he want to sign, `Yeah.' He said —
"Q. What did he say?
 "A. He said, `I might —' something like, `I might as well talk to you, I killed her.' Something like that."
Lieutenant Copeland stated that, at the time he talked with appellant, he had no knowledge that appellant had any mental problems. Lieutenant Copeland testified that appellant "may have been slightly nervous. He wasn't overly nervous." Lieutenant Copeland later testified before the jury that at no time did appellant seem incoherent. "He seemed to know what was going on. Aware of everything."
Appellant next testified outside the jury's presence that it was his voice that appeared on the tape recording and that he had, in fact, signed a waiver. Appellant recalled that he had been told he had the right to remain silent and the right to have a lawyer. Appellant remembered being told specifically that he would be provided with a lawyer before being questioned, but that he didn't want one because he was guilty and it "wouldn't do me no good down here." Appellant stated that he understood he did not have to make a statement.
Appellant stated that he did not know what the words "waiver," "undersigned," or "constitution" meant. When asked what "any statement which I might make may be used against me in Court" meant, appellant replied, "Court of law, I guess."
On cross-examination, appellant again admitted being told that if he requested an attorney no questions would be asked until he had been provided one, but that he "just wanted to tell the truth about it."
Dr. Thomas L. Smith, Jr., testified on voir dire that in his opinion appellant could substantially *Page 834 
understand the Miranda warnings which were given to him and the waiver of counsel which he signed. Dr. Smith then stated the following concerning appellant's mental capability to understand his constitutional rights:
 "A. Despite the problems that I have outlined before that he had, there is one thing that is striking about him, is that his — He is oriented towards his rights and on one occasion while he constantly demanded to be returned to Court to have his day in Court and work with his lawyer. On one occasion had told us that he was going to call his attorney about having him sent back. He was going to demand or even bring it to Court, the fact that we were holding him there and he wanted to come back and he was entitled to his day in Court, which indicated to me that he had some working knowledge with an attorney who was on his side and I was very much impressed by his ability that he knew he had an attorney, that the attorney or lawyer was working for him, that he could call upon this lawyer to exert — Assert his legal rights and this is really where I am coming from in giving an opinion on this because of what he actually said to me while he was there, that he knew that he had legal rights and he had a lawyer working for him and he certainly understood, you know, what the charges were. He told me in exact and explicit terms of what — That he did have a right to a trial and he didn't want to be held in a mental hospital and had a right to come back and have a hearing.
"Q. He's always been very anxious to come to Court?
 "A. He wanted to come to Court and demanded his day in Court and wanted to work with his lawyer, and he called upon his lawyer in telling us and letting us know that he did not want us to waste any time getting him back, so that had a lot to do with the reason I feel like I can make this statement, that he, I think, can understand that he did not have to say anything or make a statement.
 "Q. What about the fact that that statement could be used in Court?
 "A. Used against him. I think that he could understand that certain evidentiary things could be used against him and I believe that he could have known that they would use that — Could or might or something.
 "Q. Did he seem to have any knowledge of how Court worked, now, the procedures?
 "A. Well, now, of course, what we try to understand is, do they understand their charges.
"Q. Right.
 "A. And do they know what a lawyer is and the lawyer represents them and there is a Judge that's going to be neutral and that there's another lawyer for the State that's going to try to prosecute them. I think in very general terms he understands that and wanted such a trial.
. . . .
 "A. . . . I think that he's streetwise to these — In these particular areas. And, of course, the fourth statement about if you don't have enough money to hire a lawyer the Court will appoint one for you, that he certainly seemed to understand in a broad sense that he had an attorney, that this indeed had occurred, so I'm looking back with that knowledge and that experience that I had with him at the hospital. And in the same light, this item five that if I request an attorney — That he could refuse to talk until the attorney was there to represent him, in general, I think that he understands these in a broad substantive way.
 "Q. What about the fact that — Question of waiving rights? Do you think he'd understand a concept like waiving?
 "A. I think he would understand that he doesn't have to use them. He could do — Now, the term `waiver' itself is a word — I don't believe he would understand that particular word, but I think he might understand the principles contained, that he wouldn't have to use a certain right.
 "Q. Any time we're talking in kind of abstract terms there, would he have difficulty understanding abstract terms? *Page 835 
 "A. He does have — He would have some trouble with abstracts, but I think some broad principles contained in these that he does understand.
 "Q. And as far as just maybe a general term like constitutional rights, in your opinion would he —
 "A. Well, the term `constitutional', I don't know that some lawyers know all about that, particularly, you know. What I'm saying is there is a — I'm wondering about — Sometimes I — Well, I think that the word `constitutional', he probably knows that there are — There is an instrument that has — Gives broad rights. Now, as far as what specifically, that would be a problem. But I think that he does understand that there were certain rights that he has. He demanded them while we were there, you know, in the hospital. That I have certain rights to a trial and if you don't move along rapidly I'm going to call my lawyer, and it's in the record that he said that."
It was Dr. Smith's opinion that appellant was educably mentally retarded which is above being trainably mentally retarded.
Dr. J. Stephen Zeigler testified that, based on his November 9, 1979, evaluation of appellant as a schizophrenic paranoid, a person in appellant's condition could not freely make a rational choice in exercising his constitutional rights, "I do not think he is capable of understanding his constitutional rights or of appreciating the consequences of waiving those rights if he did understand them."
On cross-examination, Dr. Zeigler testified that his opinion that appellant could not understand his constitutional rights was based on the November 9, 1979, interview. The following exchange then occurred:
 "Q. And you're not saying in what condition — You don't know in what condition he was mentally on the date that he gave this — Signed this waiver which was the 13th of February, 1980, at 4:30 a.m. in the morning, do you sir? You're not saying you knew his mental condition at that date and time, are you, sir?
 "A. I would disagree with you. I am saying it because mental retardation does not come and go and I was basing my statement not on his schizophrenia but on the mental retardation." (Emphasis added.)
Sergeant David Nichols Gartman testified that, when he saw appellant at the scene prior to questioning, appellant was coherent, that he seemed adjusted to his surroundings and didn't seem nervous. "His speech and his actions were normal. . . . He appeared to me to be normal." Sergeant Gartman stated that appellant did not appear to be very well educated, but other than that he appeared completely normal.
As this court stated in Hines v. State, 384 So.2d 1171, 1172
(Ala.Cr.App.), cert. denied, 384 So.2d 1184 (Ala. 1980):
 "Under the Constitutions of the United States and the State of Alabama, any suspect of a crime is guaranteed the right of assistance of counsel and the right to remain silent during in-custody police interrogation. So sacred are these rights that any statement obtained in violation of them is inadmissible in a subsequent criminal proceeding. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The suspect may, of course, waive these rights provided that the waiver is knowingly and intelligently made. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). However, the United States Supreme Court has stated:
 "`[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. Escobedo v. State of Illinois, 378 U.S. 478, 490, n. 14, 84 S.Ct. 1758, 1764, 12 L.Ed.2d 977. This court has always set high standards of proof for the waiver of constitutional rights, Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), and we reassert these standards as applied to in-custody interrogation.' Miranda, 384 U.S. at 475, 86 S.Ct. at 1628. *Page 836 
 "An extrajudicial confession is prima facie involuntary and inadmissible. C. Gamble, McElroy's Alabama Evidence, § 200.02 (1) (3rd ed. 1977). The prosecution must prove `at least by a preponderance of the evidence' that that confession was voluntary. Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)."
However, the mental subnormality of an accused does not in and of itself render a confession involuntary. Ellis v. State,398 So.2d 402, 403 (Ala.Cr.App. 1981) and cases cited therein. Here, as in Ellis, supra, the trial judge had an opportunity to observe the demeanor and character of appellant when appellant testified at the suppression hearing. Also see Brown v. State,393 So.2d 513 (Ala.Cr.App. 1981) where, as in this case, the accused had an I.Q. of 55 and the trial court had the opportunity to observe the accused's demeanor and character. In most cases the defendant's mental deficiency is but one factor to be considered in the "totality of the circumstances" surrounding the confession. Garrett v. State, 369 So.2d 833
(Ala. 1979); Hines, supra.
In applying the principles of law addressed in the above cases to the facts before us, we find no abuse of discretion in the ruling of the trial court admitting the tape recorded confession. Considering the totality of the circumstances, we affirm the trial court's judgment that appellant had the mental capability to make a knowing and intelligent waiver of his constitutional rights.
The trial court did not commit reversible error in excluding defendant's exhibits 5 and 7 from the evidence. Appellant contends that these exhibits were relevant to show that he was suffering from a mental illness at times close in proximity to the time he killed the deceased. Defendant's Exhibit 5 consisted of certain clinical "materials" of appellant made at the C.E.D. Mental Health Center in Gadsden. Defendant's exhibit 7 consisted of hospital records from the Holy Name of Jesus Hospital in Gadsden which pertained basically to the deceased's pregnancy tests that were conducted shortly before her death. It should be pointed out that voluminous records from Bryce Hospital were admitted on behalf of appellant which detail with particularity his mental condition. Also, a record documenting appellant's condition at the time he was interviewed by Dr. Zeigler was admitted.
With respect to defendant's exhibit 5 it must initially be noted that nowhere in the record is it demonstrated that that exhibit was properly certified in accordance with Alabama Code § 12-21-7 (1975). Proper certification is requisite to the introduction of copies of hospital records. Alabama Code §12-21-6 (1975). There is no indication in defendant's exhibit 5 that it was correctly certified and affirmed in writing by the proper custodian. Instead, James J. Cody signed a memorandum as "Center Director" entitled: "RESPONSE TO: Subpoena Duces Tecum of the Circuit Court Etowah County, Alabama" requesting "these materials be delivered into the personal custody of Judge Cyril Smith . . ." Defendant's exhibit 5 contains no information that James J. Cody, or anyone else, was the proper custodian for the records. Nor is there any reference in the exhibit that C.E.D. Mental Health Center was "a hospital organized or operated pursuant to or under the laws of Alabama." Further, there is no demonstration that the materials contained in defendant's exhibit 5 were "exact, full, true and correct" copies of appellant's records. The only "certification" of the "materials" came from Judge Cyril Smith that he had received them. In short, while the certificate of the custodian of hospital records is not required to be verbatim of the form set out in Section 12-21-7, its form must be substantially the same. Here, defendant's exhibit 5 fell far short of that requirement and for that reason alone was properly excluded.
In addition, the "materials" contained in defendant's exhibit 5 are replete with hearsay and were properly excluded for that reason as well. Lowery v. State, 55 Ala. App. 514,317 So.2d 365, cert. denied, 294 Ala. 763, 317 So.2d 372 (1975). If a trial *Page 837 
court's ruling is correct for any reason, it will not be reversed on appeal even if the trial court assigned the wrong reason for its ruling. Harnage v. State, 290 Ala. 142,274 So.2d 352 (1972).
It should be noted that appellant attempted to introduce exhibit 5 during the testimony of Dr. Zeigler. Dr. Zeigler's name appears nowhere in the "materials" which were proferred and it was admitted that Dr. Zeigler had simply "reviewed" the exhibit in making his opinions concerning appellant's mental condition. Dr. Zeigler's opinions are well documented in the record. The admission of defendant's exhibit 5, upon which his opinions were at least partially based, would thus have been cumulative.
Again, we find that the admission of defendant's exhibit 7 would, likewise, have been cumulative of evidence otherwise admitted. There was repeated testimony from appellant's own lips that he had, on more than one occasion, taken the deceased to "have her checked at the hospital" for pregnancy. Even assuming defendant's exhibit 7 was relevant, which we do not hold, the erroneous exclusion of evidence in the first instance can be cured by the subsequent disclosure of substantially the same facts. Smith v. State, 393 So.2d 529 (Ala.Cr.App. 1981).
We have reviewed the issues in this case as presented by appellant. In addition, we have searched the record, as required by law, for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.