[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 230 
Jerry Wayne Boggan was indicted for feloniously taking $1,232.05, the personal property of Penny Williams, from her person and against her will, by violence or threat of violence, and in the course of committing such robbery, intentionally killing Penny Williams by smothering her with his hand or by beating on her head with a blunt instrument, in violation of § 13A-5-31 (a)(2), Code of Alabama 1975. The jury found the appellant "guilty of the capital offense as charged in the indictment" and the appellant was sentenced to life imprisonment without parole.
Woodrow Foster testified that in 1978 he lived in a trailer which was located in Penny Williams' yard on Carver Avenue. He stated that the appellant lived down the street. He said that on September 12, 1978, he got off work at 3:30 p.m. and went home. He said that when he arrived home *Page 231 
he saw "Aunt Penny" sitting on her front porch and the appellant was down the street sitting on his mother's front porch. He said that he fixed supper and went to visit a friend. He said that as he was leaving his trailer he saw the appellant at "Aunt Penny's."
Mr. Foster further testified that when he returned he stopped at Ms. Williams' home to check on her. He said he knocked on her door but no one answered. He stated that he entered the home, saw a light on in the kitchen and looked around in the kitchen. He stated that when he did not see "Aunt Penny" in the kitchen he left and went to Annie Fox's home. He said that Ms. Fox was "Aunt Penny's" niece. He said that he told Ms. Fox he did not see anyone at "Aunt Penny's" house and asked her to go back with him. He said they went in "Aunt Penny's" home, looked around, went to her bedroom and turned on the light. He said "Aunt Penny" was on the floor between the bed and the wall and that she seemed to be dead.
Mr. Foster testified that "Aunt Penny's" home had a front and back door, but the back door was nailed closed and could not be used. He further stated that "Aunt Penny" always carried a pistol and then identified the gun in evidence as her pistol. He said that she kept money in a metal box in her closet. He stated that when they found "Aunt Penny" the closet where she kept her money was open, and the contents of the closet were scattered on the floor of the room.
Jay Glass testified that he was a coroner employed by the Jefferson County Coroner-Medical Examiner's Office. He stated that he assisted in the autopsy of Penny Williams. He stated that there were multiple lacerations of the scalp and face — at least eight, and there were multiple bruises and abrasions. He stated there were skull fractures beneath two of the lacerations. He testified that the lacerations could have been caused by being struck with a pistol and that the cause of death was asphyxia combined with blunt force injuries.
John Henry Bester testified that he was driving home from work at approximately 9:15 p.m. on September 12, 1978, when he was flagged down by a man walking along the side of the road. He identified the appellant as the man who flagged him down. He stated that he was approximately one and one-half mile from Carver Avenue. He said that the appellant offered him twenty dollars to give him a ride to Bessemer, Alabama. He said that he refused to give the appellant a ride and that the appellant then offered him twenty dollars more, which he again refused. He said that the appellant dropped a money bag full of change on the ground beside the car and some of the change spilled out of the bag. He stated that the appellant then told him he needed to get away because he had just robbed someone. Mr. Bester identified a money bag as the one that the appellant had dropped and stated that he helped the appellant pick up the change.
Mr. Bester testified that the appellant saw a police car driving towards them and that the appellant took a gun from the front of his pants and threw it under the car. He stated that the police drove up and asked the appellant where he got all of the money and that the appellant stated he won the money playing "skins." He testified that the appellant was intoxicated. He stated that the police started to drive away, then stopped their car and told them to put their hands on the car. He stated that the police picked the gun up, then searched them. He stated that the police found more money on the appellant and took both men to jail. He stated that while in the jail the appellant told him that he (appellant) would tell the police that Bester had nothing to do with his act.
Lester Sherrod testified that in 1978 he was the dispatcher for the Brownville Police Department. He stated that on the night of September 12, 1978, Officer Horton and Officer Proveaux brought two men into the jail. He stated that they gave him a pistol to keep and identified the pistol in evidence as the one he was given by the officers. He stated that he placed the pistol in his desk drawer, kept it about an *Page 232 
hour, then turned it over to Officer Todd of the Birmingham Police Department. He further stated that, from the time he received the pistol until he turned it over to Officer Todd, no one had access to the pistol.
John Sturgeon testified that he was Penny Williams' nephew. He stated that he went into "Aunt Penny's" house along with Mr. Foster and Ms. Fox and that they found "Aunt Penny" dead in her bedroom. He said that he knew "Aunt Penny" kept money in her home and that she kept the money in a metal box. He further testified that about one week after "Aunt Penny's" death he found the metal box in a field beside the Health Center. He stated that he called the police and when they arrived he took them to the box. He stated that the police picked up the box and took it with them. He stated that normally the box had a lock on it, but when he found the box the lock was missing.
Mr. Sturgeon testified that he saw the appellant at "Aunt Penny's" home on September 12, 1978. He also said that the appellant knew where "Aunt Penny" kept her money. He further stated that "Aunt Penny" owned a pistol and identified the pistol in evidence as her pistol.
Annie Fox testified that she was Penny Williams' niece and lived down the street from "Aunt Penny." She stated that "Aunt Penny's" house had a front and back door but the back door had been nailed closed for years.
Ms. Fox testified that "Aunt Penny" kept money in a metal box, and this box was inside her closet. She stated that "Aunt Penny" stored her coin money in a money bag, which was inside the metal box. She identified the money bag, which was found in the appellant's possession at the time of his arrest, as the one in which "Aunt Penny" kept her change. When questioned as to how she could be sure this money bag was "Aunt Penny's," Ms. Fox stated that she counted the money for "Aunt Penny" and wrote the amount on the outside of the bag. She further stated that "Aunt Penny" had $389.80 in change and $1,500 in paper money, and this money was stored inside a metal box with a lock on it.
Ms. Fox testified that "Aunt Penny" always carried a pistol and identified the pistol in evidence as "Aunt Penny's." She stated that on September 12, 1978, the appellant was living with "Aunt Penny" and that she had seen him at "Aunt Penny's" house that day. She stated that during the night of September 12, 1978, Mr. Foster came to her house and they went to check on "Aunt Penny." She stated that they found "Aunt Penny" dead in her bedroom. Ms. Fox further testified that the closet was open and "Aunt Penny's" money box was missing, and that the drawers from "Aunt Penny's" chifforobe had been pulled out and emptied. She also said that the appellant knew "Aunt Penny" kept money in her house.
Hugh Thomas Yester testified that in 1978 he was an evidence technician employed by the Birmingham Police Department. He stated that he took a number of photographs of Penny Williams' home. These photographs included one of the back door of the house and Mr. Yester testified that there were cobwebs around the bottom of that door.
Clay Horton testified that in 1978 he was employed as a police officer in the Brownville Police Department. He stated that he was the officer who arrested the appellant on September 12, 1978. He stated that on that night he and his partner were on patrol when at approximately 10:00 p.m. they spotted a car parked on the side of the road. He stated that one man was sitting in the car and the appellant was standing beside the car on the drivers' side of the vehicle. He stated that when he first noticed the men, the appellant was kneeling beside the car. He said that he pulled up beside the stopped car and asked if there was a problem. He said the appellant told him he was picking up some change he had dropped on the street. Officer Horton stated that the appellant said he won the money playing "skins." He stated that he noticed a bank bag, which contained a large *Page 233 
amount of change, in the appellant's hand. He identified the money bag in evidence as the one the appellant was holding that night.
Officer Horton testified that as he was leaving he noticed a pistol lying under a back tire of the car. He identified the pistol in evidence as the weapon he saw. He stated that the appellant claimed ownership of the pistol and at this point both men were "patted down." He stated that he found a large lump in the appellant's front pocket which turned out to be a roll of money. Officer Horton testified that the men were then placed in the patrol car and while transporting them to the Brownville Police Station he received a radio broadcast that there had been a shooting on Carver Avenue.
Officer Horton testified that upon arriving at the police station, he locked the money in his locker and turned the gun over to Lester Sherrod. He stated he later turned the money and the bag full of change over to R.K. Crocker.
Donnie Todd testified that he was employed as an evidence technician by the Birmingham Police Department. He stated that on September 12, 1978, he saw a black male at the Brownville Police Station, and this black male was identified to him as Jerry Wayne Boggan. He stated that he took photographs of the appellant, including photographs of apparent blood stains on the appellant's arms and clothes.
Officer Todd testified that he collected swabbings from the appellant, which he turned over to Chip Walls at the State Department of Forensic Sciences. He stated that he also turned over the shirt the appellant was wearing on September 12, at the same time he turned over the swabbings. He further stated that he took the pistol into his possession, collected scrapings of dried blood from it, and turned these scrapings over to the State Department of Forensic Sciences.
R.K. Crocker testified that he was employed as an evidence technician by the Birmingham Police Department. He stated that he took photographs at the scene of Penny Williams' death. He stated that there appeared to be a gunshot into the bed. He further stated that no iron poker was found at the scene.
Rodger Morrison testified that he was employed by the Alabama Department of Forensic Sciences as a forensic serologist. He testified to the results of blood sample tests he made. He stated that blood on the appellant's shirt was the same blood type as Penny Williams, as were the scrapings from the gun.
Sergeant James Gay testified that he was employed by the Birmingham Police Department and that he was the chief investigator in Penny Williams' homicide. He stated that on September 12, 1978, at approximately 10:25 p.m., he went to the home of Penny Williams. He stated that he subsequently went to the Brownville Police Station where he saw the appellant and observed what appeared to be blood stains on the appellant's arms. He stated that he asked the appellant his name, date of birth, and address and the appellant replied that he was staying with "Aunt Penny."
Sergeant Gay testified that when the appellant was being transported to the Birmingham City Jail, he motioned for Sergeant Gay and told him there were too many people at the Brownville Jail, but if he would come to the City Jail he would tell him who killed "Aunt Penny."
Sergeant Gay testified that on September 13, 1978, at 11:08 a.m., he conducted an interview with the appellant at the Birmingham City Jail. He stated that he identified himself and told the appellant that he was a suspect in "Aunt Penny's" death. He stated that the appellant was not threatened or offered any promises of reward. He stated that the appellant was advised of his Miranda rights and that the appellant stated he understood those rights and would talk to him. He testified that the appellant then gave a statement to him. Sergeant Gay stated that the appellant said he had been staying with "Aunt Penny" for one week and that she was old and sick. *Page 234 
The appellant also told him that he had not seen "Aunt Penny" since noon on September 12, 1978, and at that time she was on her front porch. Sergeant Gay further stated that the appellant told him he had gone to "Aunt Penny's" around 3:00 p.m., but she was not home and the door was locked. He stated that the appellant said he was not at "Aunt Penny's" after 3:00 p.m. that day. The appellant also told Sergeant Gay that it was common knowledge "Aunt Penny" kept money in her house, but he did not know where she kept her money. The appellant told Sergeant Gay in this statement that he was walking to Hillman when a man stopped and asked him for a cigarette. The appellant stated they were talking when the police arrived. He further told Sergeant Gay that he never asked this man to give him a ride, and he had no money with him at the time. The appellant also denied seeing a pistol the night before and telling the police it was his pistol.
Sergeant Gay testified that he took another statement from the appellant at 4:45 p.m. on September 14, 1978. He stated that the appellant was not threatened or offered any promise of reward, he was advised of his Miranda rights which he stated he understood, and he agreed to talk to Sergeant Gay. In this statement the appellant told Sergeant Gay that on the night in question he had been drinking beer and whiskey. He went to "Aunt Penny's" house and knocked twice, but nobody answered. He said he heard the back door open and then close, so he knocked again. He stated he then discovered the door unlocked and went inside. He said that once he was inside he saw money all over the floor, along with a "poke iron." He said "Aunt Penny's" gun was on the bed and he thought she must have gone outside so he went to the back door, which was open. He said he was coming back through the house when he saw her on the floor behind the bed. He said he was scared so he just got the money and the gun and ran. The appellant further said he was walking over "Hillman hill" and flagged down a man and offered him twenty dollars to take him to Bessemer. He said he saw the police coming so he put the gun on the ground and dropped the money.
The state then rested its case.
Jerry Wayne Boggan testified in his own behalf. He stated that on September 12, 1978, he was living with "Aunt Penny." He stated that he arrived home that night at approximately 9:00 p.m. after drinking beer and smoking "reefer" all day. He said that he drank about nine beers and smoked around ten joints over the course of that day. He said that when he arrived home "Aunt Penny" asked him for a cigarette, which he gave her, and then he lay down on the couch. He said that "Aunt Penny" came out of the kitchen "hollering" that someone had put snakes in her refrigerator. He said she was standing in the doorway to her bedroom and asked him who put the snakes in her refrigerator. He said that he started laughing and "Aunt Penny" reached in her pocket and pulled out her gun. He said he grabbed a piece of iron and "told her to get back."
The appellant further testified that "Aunt Penny" started toward him with the gun, grabbed him, and they fell on the bed. He stated that as they were struggling the gun went off right by his head. He said he started hitting her with the piece of iron to get her off of him. He said he then put his hand over her mouth to quiet her down and she stopped moving. He stated that he tried to pull her all the way onto the bed so he could see what was wrong with her, but she slipped to the floor. He stated that he felt her heart and it had stopped beating. He said at that time he did not think anyone would believe what had happened, so he went through the house looking for her money, and when he found it he took the money and the gun and left.
The appellant testified that he beat the lock off of the metal box with a gun, took the money out, and then threw the box away. He stated that he saw a car, flagged it down, and asked for a ride to Bessemer. He said he was asking for a ride when he dropped the money beside the *Page 235 
car. He said that he was picking up the money when the police drove up and asked him where he got that money. He said that he told the police he won the money playing "skins." The appellant then testified that the police started to drive away, then stopped and took him and the driver of the car into custody. He stated that he did not tell the police the truth because he was afraid that no one would believe his story.
 I (A)
The appellant contends that the trial court erred in denying his motion to suppress evidence allegedly obtained as a result of an illegal search and seizure. He specifically argues that the Brownville Police officers had no probable cause to search him.
Section 15-5-30, Code of Alabama 1975, authorizes any law enforcement officer to "stop any person abroad in a public place whom he reasonably suspects is committing, has committed or is about to commit a felony or other public offense . . .". Such a stop by a police officer is "permissible where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868,20 L.Ed.2d 889 (1968); Butler v. State, 380 So.2d 381 (Ala.Crim.App. 1980). Furthermore, "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Rudolph v. State, 371 So.2d 962 (Ala.Crim.App.), cert. denied, 371 So.2d 965 (Ala. 1979); Moore v. State,415 So.2d 1210 (Ala.Crim.App. 1982); Sterling v. State, 421 So.2d 1375
(Ala.Crim.App. 1982).
In this case the officers had observed the appellant beside a car parked on the side of the road at ten o'clock at night. He was bending over picking up money and had a money bag under his arm. The appellant stated he won the money in a card game. The officers were leaving when they observed a pistol on the ground beside the rear tire. Upon seeing the pistol on the ground and the appellant with a large sum of money in a money bag, the officers had reasonable cause to investigate further and to that end seize the men and conduct a search for more weapons. Moreover, upon hearing the radio dispatch that there had been a shooting on Carver Avenue, only a few blocks from where the appellant was observed, the officers had greater reason to take the men to the station for further investigation. Therefore, the money found on the appellant, along with the pistol, was not obtained in an illegal search and seizure. The officers had sufficient probable cause. See Preyer v. State, 369 So.2d 901
(Ala.Crim.App. 1979); Butler v. State, supra; Tice v. State,386 So.2d 1180 (Ala.Crim.App.), cert. denied, 386 So.2d 1187
(Ala. 1980); Dolvin v. State, 391 So.2d 666 (Ala.Crim.App. 1979), affirmed, 391 So.2d 677 (Ala. 1980); Johnson v. State,406 So.2d 446 (Ala.Crim.App. 1981).
 (B)
The appellant argues further that swabbings of blood-stains on his forearms and his blood-stained clothing were improperly obtained as a result of an illegal search.
One of the recognized exceptions for the requirement of a search warrant is a search incident to a lawful arrest.McClellan v. State, 415 So.2d 1238 (Ala.Crim.App. 1982). Furthermore, this court has held on numerous occasions that, when a suspect has been validly arrested, the seizure of physical evidence from the person is legally obtained. Sellersv. State, 48 Ala. App. 178, 263 So.2d 156 (Ala.Crim.App. 1972);Thomas v. State, 50 Ala. App. 227, 278 So.2d 230 (Ala.Crim.App. 1973); Turk v. State, 53 Ala. App. 106, 298 So.2d 37
(Ala.Crim.App. 1974); Lackey v. State, 54 Ala. App. 693,312 So.2d 96 (Ala.Crim.App. 1975); Mauldin v. State, 402 So.2d 1106
(Ala.Crim.App. 1981). The obtaining of physical evidence in this case was more than justified as being incident to a lawful arrest based upon probable cause that a murder had been committed. *Page 236 
 II
The appellant contends that the trial court committed reversible error by allowing into evidence four statements that he made to police officers.
 (A)
The appellant argues that admission of his statement to Officer Horton that he owned the gun found under the car was reversible error because he was not advised of his rights as set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
In order to deem a pre-arrest statement inadmissible we must determine whether the challenged statement was made pursuant to a custodial interrogation or custodial setting. A custodial interrogation has been defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any way."Miranda v. Arizona, supra; Oregon v. Mathiason 429 U.S. 492,97 S.Ct. 711, 50 L.Ed.2d 714 (1977). However, the procedural safeguards outlined in Miranda do not apply to "traditional investigatory functions (such) as general on-the-scene questioning." United States v. Montos, 421 F.2d 215 (5th Cir. 1970), cert. denied, 397 U.S. 1022, 90 S.Ct. 1262,25 L.Ed.2d 532 (1970); Hall v. State, 399 So.2d 348 (Ala.Crim.App. 1981). The facts of each case must be examined in order to determine whether the defendant was questioned merely as part of a general investigation or was subjected to a custodial interrogation. See Cork v. State, 433 So.2d 959 (Ala.Crim.App. 1983); Hall v. State, supra.
In the present case, Officer Horton merely asked who owned the gun which was found on the ground under the car. The appellant answered that he owned the gun after some hesitation. It was after this that the men were frisked and taken into custody. Such a question by Officer Horton must be viewed as general on-the-scene questioning in light of the circumstances. There was no violation of the appellant's rights and the trial court properly admitted the appellant's statement into evidence.
 (B)
The appellant argues that a statement he made at the police station was inadmissible because he was highly intoxicated and unable to exercise a knowing and intelligent waiver of his rights.
The facts have shown that on September 13, 1978, the appellant made the following statement, to Sergeant Gay, as he was being escorted out of the Brownville Police Station to be transported to the Birmingham City Jail: "There's too many people here for me to talk to you, but you come over to the City Jail and I'll tell you who killed Aunt Penny." (R. 339-355) The testimony further shows that the appellant was intoxicated and that at the time of making this statement the appellant called Sergeant Gay over to him to make his statement.
This court has held many times that in order for intoxication to render a confession inadmissible it must amount to a "mania" which impairs the will and mind to the extent that the person confessing is unconscious of the meaning of his words. A lesser state of intoxication will not render a confession inadmissible. Willis v. State, 342 So.2d 802 (Ala.Crim.App. 1976); Tice v. State, 386 So.2d 1180 (Ala.Crim.App. 1980);Palmer v. State, 401 So.2d 266 (Ala.Crim.App. 1981). In the present case it was not demonstrated that the appellant was so highly intoxicated as to be at a point of "mania."
Moreover, a voluntary, spontaneous statement made by a defendant to police officers, not prompted by police questioning, is admissible against the defendant even though he has not been given his Miranda warnings. Terry v. State,397 So.2d 217 (Ala.Crim.App.), cert. denied, 397 So.2d 223 (Ala. 1981); Ervin v. State, 399 So.2d 894 (Ala.Crim.App.), cert. denied, 399 So.2d 899 (Ala. 1981); Jelks v. State,411 So.2d 844 (Ala.Crim.App. 1981). The appellant's statement to Sergeant Gay was *Page 237 
spontaneous, voluntary and not prompted by questioning. A careful review of the circumstances surrounding the statement reveals that the trial court did not err in admitting such statement.
 (C)
The appellant also argues that the statement he made on September 13, 1978, at approximately 11:00 a.m. should not have been admitted into evidence because of his state of intoxication and that he could not make a knowing and voluntary waiver of those rights.
The appellant's argument that he was too intoxicated to make a knowing and intelligent waiver of his rights at 11:00 a.m. on September 13, 1978, is wholly without merit. This statement was not given until more than twelve hours had passed from the time the appellant was initially detained. The record shows that the appellant was coherent and fully aware of the situation at this time. See Tice v. State, supra; Hollis v. State, 399 So.2d 935
(Ala.Crim.App. 1981); Palmer v. State, supra.
His argument that his statement was not voluntary is likewise without merit. The State must show voluntariness and a Miranda
predicate in order for a statement to be deemed admissible.Thomas v. State, 373 So.2d 1149 (Ala.Crim.App.), affirmed,373 So.2d 1167 (Ala. 1979). The prosecution brought forth testimony which properly showed that the appellant was advised of hisMiranda rights, that he had not been threatened, coerced or promised any reward for making a statement, and that he freely and voluntarily waived his rights. It is the province of the trial judge to first determine the voluntariness of a statement in a voir dire examination outside the presence of the jury, and unless there is clear abuse this decision will not be overturned. Duncan v. State, 278 Ala. 145, 176 So.2d 840
(1965); Shewey v. State, 48 Ala. App. 730, 267 So.2d 520
(Ala.Crim.App. 1972); Bills v. State, 49 Ala. App. 726,275 So.2d 706 (Ala.Crim.App. 1973); Hardy v. State, 409 So.2d 996
(Ala.Crim.App. 1982); Shorts v. State, 412 So.2d 830
(Ala.Crim.App. 1981); Snider v. State, 422 So.2d 807
(Ala.Crim.App. 1982). We are of the opinion that the trial judge's conclusion that the statement was voluntary was adequately supported by the facts, and that the trial judge properly admitted the statement into evidence.
 (D)
The appellant contends that since the statements of September 13, 1978, were not admissible, the statement he gave on September 14, 1978, was not admissible as a direct product of the earlier statements. "Though it may be proper to exclude any confession (or statement) made after an involuntary one on the basis that the later confession (or statement) flows from the same improper influence or inducement as the earlier one, once it is shown that the improper influence or inducement has been dispelled, there is no reason not to admit the subsequent confession (or statement)". Levison v. State, 54 Ala. 520
(1875); Hollis v. State, supra. The statements of September 13, 1978, were properly admitted, as was the statement of September 14, 1978. It was shown to be freely and voluntarily given, after a knowing and intelligent waiver of the appellant's rights.
 III
The appellant alleges reversible error was committed when the prosecution commented, during closing arguments, on the possibility of the sentence of life without parole being changed someday in the future.
During the appellant's attorney's closing argument he stated: (R. 434-435)
 "The punishment, as you have been told, for capital murder is life without parole. And the courts have said that clearly means, that he will be imprisoned — he was 22; he's 26 now — that he will be in prison when he is 60 years old for the acts of one night of his life."
On rebuttal, the State made the following comments: (R. 439) *Page 238 
 "Life without parole today is life without parole, but we never know whether the law could change in ten years or twenty years.
"MR. ANDREWS: I object to that Judge.
"MR. GOMANY: He went into all that, Judge.
"THE COURT: I'm going to overrule your objection."
This court has held on many occasions that in order to determine whether the above statement of the prosecutor was improper, "it must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer." Washington v. State, 259 Ala. 104, 65 So.2d 704
(1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App. 1977);Rutledge v. State, [Ms. 5 Div. 610, August 16, 1983] (Ala.Crim.App. 1983). The rule in Alabama is that remarks or comments of the prosecuting attorney, including those which might or would otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements. Shewbart v. State, 33 Ala. App. 195,32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244 (1947);Camper v. State, 384 So.2d 637 (Ala.Crim.App. 1980); Wilder v.State, 401 So.2d 151 (Ala.Crim.App.), cert. denied,401 So.2d 167 (Ala. 1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606,70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586
(Ala.Crim.App. 1983); Rutledge v. State, supra.
This record reflects that the prosecutor's argument was merely a reply in kind to the appellant's counsel's argument concerning punishment. Therefore, the prosecutor's argument was not improper.
 IV
The appellant argues that the trial court erred to reversal in admitting a rare coin recovered from the appellant's pants while he was in the Brownville Police Station.
The prosecution contends that this coin was admissible as part of the res gestae of the crime for which the appellant was on trial. Whether evidence should be admitted as part of the res gestae must be determined from the particular facts of the case and character of the crime. Pugh v. State, 30 Ala. App. 572, 10 So.2d 833 (1942); Lang v. State, 40 Ala. App. 705,122 So.2d 526, reversed, 271 Ala. 1, 122 So.2d 533 (1960); Price v.State, 41 Ala. App. 239, 128 So.2d 109 (1961); Johnson v. State,335 So.2d 663 (Ala.Crim.App.), cert. denied, 335 So.2d 678
(Ala. 1976), cert. denied, 429 U.S. 1026, 97 S.Ct. 649,50 L.Ed.2d 629 (1976).
The evidence shows that the appellant was found with a money bag full of coins, and these coins were the property of Penny Williams. There was testimony at trial that "Aunt Penny" had many very old, rare coins in her savings. A rare coin was discovered when it fell from the appellant's pants pocket at the Brownville Police Station. Therefore, the coin was relevant as part of the res gestae and the trial court was not in error. See Roynica v. State, 54 Ala. App. 436, 309 So.2d 475
(Ala.Crim.App.), cert. denied, 293 Ala. 772, 309 So.2d 485 (Ala. 1975), cert. denied, 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 85
(1975); Burlison v. State, 369 So.2d 844 (Ala.Crim.App.), cert. denied, 369 So.2d 854 (Ala. 1979); Lofton v. State, 371 So.2d 988
(Ala.Crim.App. 1979); Allen v. State, 382 So.2d 1147
(Ala.Crim.App.), cert. denied, 382 So.2d 1158 (Ala. 1980).
 V
The appellant contends that the trial court committed reversible error in allowing testimony about the results of a blood and chemical analysis of a shirt the appellant wore on the night of Penny Williams' death. He argues that a proper chain of custody had not been shown by the State. Such testimony revealed that blood stains on the appellant's shirt were of the same type as the victim.
Officer Donnie Todd testified that the shirt was in the same condition when he *Page 239 
turned it over to the Alabama Department of Forensic Sciences as it was when he collected it the night the appellant was arrested. He stated that the shirt was sealed in a paper bag and placed in his locker. He further stated that when he took it to the Department of Forensic Sciences, the seal on the bag had not been tampered with or broken. He stated that he turned the evidence over to Chip Walls. He was shown a photograph of the appellant, which was taken on the night of his arrest, and he said that the shirt shown in the photograph was the one he turned over to Chip Walls.
Rodger Morrison testified that he received a shirt labeled "Jerry Wayne Boggan" from the director of the laboratory. He testified that the shirt shown in the photograph of the appellant was the same shirt on which he conducted a blood stain analysis. He stated that the receipt for the shirt was signed by Officer Todd, Chip Walls, Dr. Buttram (director of the lab), and himself.
We are convinced that the State showed an unbroken chain of custody. "To warrant the reception of evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." Sexton v. State,346 So.2d 1177 (Ala.Crim.App.), cert. denied, 346 So.2d 1180 (Ala. 1977); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App. 1982);Sims v. State, 428 So.2d 162 (Ala.Crim.App. 1982). In the present case a sufficient chain of custody was shown to warrant reception of the testimony and to establish the reasonable probability that the shirt had not been tampered with or changed. Thomas v. State, 356 So.2d 210 (Ala.Crim.App. 1977), writ quashed, 356 So.2d 214 (Ala. 1978); Jackson v. State,375 So.2d 1271 (Ala.Crim.App.), cert. denied, 375 So.2d 1274 (Ala. 1979); Lynn v. State, 380 So.2d 366 (Ala.Crim.App. 1980);Mauldin v. State, 402 So.2d 1106, 1110 (Ala.Crim.App. 1981).
 VI
The appellant contends that the statute under which he was indicted has been declared unconstitutional by the United States Supreme Court in Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). He further contends that the Alabama Supreme Court usurped the role of the legislature inBeck v. State, 396 So.2d 645 (Ala. 1980).
This court has held on numerous occasions that the reconstruction of the 1975 Death Penalty Law was constitutional. Potts v. State, 426 So.2d 886 (Ala.Crim.App.), affirmed, 426 So.2d 896 (Ala. 1983); Raines v. State,429 So.2d 1104 (Ala.Crim.App.), affirmed, 429 So.2d 1111 (Ala. 1982);Colley v. State, 436 So.2d 11 (Ala.Crim.App. 1983); Coulter v.State, 438 So.2d 336 (Ala.Crim.App. 1982), affirmed,438 So.2d 352 (Ala. 1983); Giles v. State, [Ms. 6 Div. 86, January 10, 1984] (Ala.Crim.App. 1984); Jackson v. State, [Ms. 6 Div. 794, January 10, 1984] (Ala.Crim.App. 1984); Beck v. State, [Ms. 7 Div. 909, March 20, 1984] (Ala.Crim.App. 1984); Cochran v.State, [Ms. 6 Div. 886, April 24, 1984] (Ala.Crim.App. 1984). The statute under which the appellant was indicted is constitutional and we find no error in the appellant's prosecution under such statute.
 VII
The appellant argues that there was insufficient evidence presented at trial to support the jury's verdict of guilty.
We have carefully reviewed the evidence in this cause and have concluded that, while the appellant presented testimony which, if believed by the jury, might have justified his conduct, there was sufficient evidence to support the jury's verdict. The evidence was conclusive that the appellant knew "Aunt Penny" kept a large amount of cash in her home. Her home was found ransacked, and her money and *Page 240 
pistol were missing. The appellant was found in possession of "Aunt Penny's" pistol and money. The appellant testified that he repeatedly struck "Aunt Penny" in the head because she had allegedly attacked him with a gun. He further stated that he placed his hand over her mouth "to quiet her down." The appellant's testimony was the third different version of that night's occurrences that he had related. "Aunt Penny's" autopsy revealed that she died as a result of asphyxiation coupled with multiple blows to her head with a blunt instrument. It further revealed that there were bruises around her mouth, which were consistent with someone applying force to the area. The appellant's shirt was stained with blood that was of the same type as "Aunt Penny's."
This evidence was properly put to the jury, which had the "responsibility of assessing the credibility of each witness and weighing all the evidence, whether direct or circumstantial, as they viewed it." Cumbo v. State,368 So.2d 871 (Ala.Crim.App.), cert. denied, 368 So.2d 877 (Ala. 1979). Moreover, a conflict in the testimony is the sole province for the jury to determine and they may properly consider conflicting statements as indicating consciousness of guilt.Cumbo v. State, supra; Hayes v. State, 395 So.2d 127
(Ala.Crim.App.), cert. denied, 395 So.2d 150 (Ala. 1981). We find no error in the jury's verdict of guilt.
The judgment of the trial court is due to be, and is hereby, affirmed.
AFFIRMED.
All the Judges concur.