[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 126 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 127 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 128 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 129 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 130 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 131 
Kenneth Earl Magwood, appellant, was indicted for the offense of robbery when the victim was intentionally killed. Ala. Code 1975, § 13A-5-31 (a)(2) (Supp. 1978) (repealed July 1, 1981).[1]
He was arraigned and pleaded not guilty. A jury found him guilty of the capital offense charged in the indictment. A sentencing hearing before the jury was held in accordance withBeck v. State, 396 So.2d 645 (Ala. 1980), and the jury fixed appellant's punishment at death. Thereafter, the trial court held a sentencing hearing, and after weighing the aggravating and mitigating circumstances, and considering the jury's fixing of the punishment at death, sentenced appellant to death by electrocution.[2]
On April 10, 1981, a crew consisting of Jimmy Carroll (trainman), Danny Pelham (conductor), and Eugene L. Norris (engineer) was operating a Southern Railway Company switch engine and train engaged in switching operations on the outskirts of Dothan. About 6:00 p.m., they picked up additional cars at Bob's Feeds and Dothan Seed and Feed Company and, with a train of approximately 22 cars, prepared to back toward the Dothan railroad yards, where the cars were to be coupled with other cars. Due to the condition of the side track upon which they were operating, they were not allowed to exceed five miles per hour. A train exceeding this speed on this track would have a tendency to rock and could possibly derail, causing serious property damage and personal injuries.
In backing the train on this occasion, it was necessary that the trainman and conductor go to the rear of the train and act as lookouts for pedestrians and vehicles because the engineer's view of the direction in which they were traveling was obstructed. In backing the train to the location of the other cars, they had to cross a public thoroughfare referred to as the Plant Street Crossing. There were no automatic warning signals at the crossing. Therefore, the engineer was required to stop the train at the crossing, and the conductor and *Page 132 
trainman were required to dismount and stop traffic until the train entered the crossing. The members of the train crew communicated with each other by "walkie-talkie" radios. When the trainman and conductor were properly situated on the rear of the train, they notified the engineer, who signaled by sounding the horn in the engine and commenced backing the train.
The train had moved only about 10 to 15 car lengths at a speed under five miles per hour, when suddenly, with a jolt, the train picked up speed and quickly reached a speed of 25 to 30 miles per hour. The train began rocking and the trainman and conductor feared a derailment. They attempted to contact the engineer by radio, but received no response. They tried a radio relay through the office, which had a stronger radio, and the engineer still did not respond. Being concerned about the ever-increasing speed and rocking of the train, the upcoming crossing, and the 12 to 15 cars sitting on the track ahead, they contemplated jumping from the train. Instead, the conductor, Pelham, went between the cars and, with some difficulty and considerable risk to himself, opened the air valve, which immediately activated the air brakes on all cars in the train. With all wheels locked, the train slid about 10 to 15 car lengths and came to a halt. Before stopping, the train went approximately 10 car lengths past the Plant Street Crossing. It stopped just short of the stationary cars sitting on the track ahead.
When the train stopped, the trainman and conductor ran back to the engine and discovered the body of the engineer, Norris, lying on the floor of the cab in front of the engineer's seat and on top of the deadman's pedal. He had been killed by a shotgun blast to the back of his neck, which had been fired from a distance of 3 to 5 feet. There was a large amount of blood in the cab, mainly under the head and body of Norris. There was blood and tissue splattered on one of the cab windows, which was broken. The deceased's right hip pocket was turned inside out and his wallet was missing.
Approximately 146 feet up the track from the engine, an unexpended 12-gauge shotgun shell with No. 2 shot was discovered. A broken Kool cigarette was found 156 feet from the engine, and four impressions of someone's feet were discovered between the tracks 135 feet from the engine. Less than 3 or 4 hours after the incident, the deceased's wallet was found in the grass near the train tracks at the rear of Dothan Seed and Feed, which is 1/4 to 1/2 mile up the tracks from where the train stopped. Various personal papers of the deceased, including his driver's license, were found with his wallet.
Bertha Thomas, who lived near the railroad track where the incident occurred, saw appellant earlier in the afternoon going toward the track and carrying a "long gun."
As a result of the information furnished by Bertha Thomas, on the same date, appellant was brought to the Dothan police station, arriving around 10:45 p.m. Early the following morning, April 11, 1981, at 1:40 a.m., after being advised of his Miranda rights, appellant made an oral statement, which was taped, implicating himself in the shooting of the engineer, Norris. He also admitted taking the engineer's wallet. Later that morning, after daylight, appellant assisted the officers in recovering the shotgun from where he had hidden it near the scene of the crime. Officer Lynn, testifying for the State, stated that upon returning to the police station after recovery of the shotgun, appellant talked with his mother in Lynn's presence. He testified that appellant's mother asked appellant if he killed the man, and he told her that he did. At 11:05 that morning, Lynn again advised appellant of his Miranda
rights and took another taped statement from him, which was similar in content to the first statement. Both statements were admitted into evidence and, in both statements, appellant admitted shooting Norris, claiming that he did not intentionally do it, but that the gun went off as they were "tussling" over it. *Page 133 
The State introduced evidence that when the shotgun was found, it had a spent shell in its chamber. Subsequent tests revealed that the shell had been fired in that gun. Evidence was also introduced showing that shot patterns from that shotgun, when fired from 3 to 5 feet, were similar to the shot pattern on the victim's clothing. Appellant's fingerprint was found on a business card from the victim's wallet and his palm print was found on the victim's bank account card, which had also been in the victim's wallet. Evidence of these prints was also introduced by the State. It was determined from blood samples that appellant and the victim both had blood type A. The clothing of appellant was examined, including a shirt, blue jeans, belt, jacket, tennis shoes, and socks. Type A human blood stains were found on one tennis shoe and on the socks.
Upon conclusion of the State's case-in-chief, appellant moved to exclude the State's evidence and for a judgment of acquittal on the ground that the State had failed to present a prima facie case of the capital crime of robbery when the victim is intentionally killed by the defendant. The trial court denied the motions.
Appellant did not testify in his own behalf. He called three witnesses in an effort to establish a defense of alibi. Cleveland Jones testified that appellant was at his house on the date of the incident from 12:45 p.m. to about 2:30 p.m. when he left to get two six-packs of beer; that he returned about 15 minutes later; that he got on the back of a passing pizza truck and left again about 5:45 p.m. and returned about 6:00 p.m.; and that appellant remained with him until about 11:00 p.m. He testified that he did not see appellant with a gun; that they were drinking; that appellant was "high"; and that appellant passed out on the porch about 9:30 p.m. and he threw water on him to awaken him. Jerome Danzy testified that he was at Jones's house on the date of the incident; that he arrived around 6:00 p.m.; that appellant was there when he arrived; that he stayed with him until around 10:30 p.m. to 11:00 p.m.; and that appellant was drinking. He testified, "I wouldn't say he was high, I'd say he had been drinking." Donald Williams testified that he arrived at Jones's house at 12:30 p.m.; that he remained until 4:00 p.m.; and that appellant was there the entire time and was drinking.
After the first three defense witnesses mentioned above had testified, defense counsel stated to the trial judge, out of the presence of the jury, that he had previously advised appellant that in his best judgment appellant should not call any of the witnesses. He further stated that he had advised appellant that the remaining witnesses to be called would not help him, but that appellant insisted on calling them. Defense counsel wanted the court to know this and wanted appellant to tell the court that he wanted to call the witnesses despite his attorney's advice. The trial judge questioned appellant, who stated that he understood his attorney's advice, but he wanted the witnesses called.
Appellant next called Grady Miller as a witness. Miller was a prisoner in the jail, and he testified that appellant was placed in the jail about 7:00 a.m. on Saturday, April 11, 1981, and remained there continuously until 9:30 a.m. to 10:00 a.m. on Sunday, April 12, 1981. This testimony was apparently offered to rebut the State's evidence that appellant visited the scene of the crime on the morning of April 11 to retrieve the shotgun and that he gave a second taped statement the same morning.
Appellant's mother, Fannie Magwood, testified that she saw her son at the police station on the morning of April 11, as he and the officers were coming into the police station with the gun, and that his head was swollen and his eyes were red. She denied that appellant had told her that he had killed the engineer. She also claimed that she had tried to see her son on April 10, but was refused permission to see him.
Arthur Young, testifying for the defense, stated that the shotgun in evidence belonged to him and that it was stolen from his house in February 1981 while he was away at work. He also stated that a television *Page 134 
was stolen from his house several months later while he was away at work and that appellant was in jail at the time the television was taken. He worked the night or "swing" shift. The apparent reasoning of appellant in offering this testimony was that the same person must have stolen both the gun and the television, since it was someone who knew that Young was working the night shift and would not be at home. Since appellant was in jail at the time the television was stolen, he, therefore, could not have been the person who had stolen the shotgun. This reasoning has obvious flaws. Young also testified that the shotgun had a tendency to accidentally fire and that it required very little pressure on the trigger to cause it to discharge. Previously, Lonnie Harden, the firearms expert, had testified that the gun had approximately a 3 1/2 pound "trigger pull," was not a "hair trigger," was a "light" trigger, but was "not unusual."
Officer Lynn was recalled by the State in rebuttal for the purpose of contradicting the testimony of Cleveland Jones and Fannie Magwood. He testified that Jones had previously told him that appellant had left his house shortly before 6:00 p.m. and returned sometime after 7:00 p.m. He stated that Jones never told him, when questioned prior to trial, that appellant had stayed at his house from 12:45 p.m. until about 5:45 p.m. with the exception of around 15 minutes when he went to get beer, or that he left on a pizza truck about 5:45 p.m. and returned about 6:00 p.m., and remained with him until about 11:00 p.m. Officer Lynn further testified that appellant's head was not swollen and that he had not been beaten or mistreated in any manner. He reiterated that appellant's mother asked appellant if he killed the man, and that appellant answered, "Yes, ma'am."
Eight issues are raised by appellant on appeal. We address them in the order presented in appellant's brief.
 I
Appellant first argues that the admission of the first taped incriminating statement made by him to Officer Lynn on the night of the shooting constitutes reversible error. He asserts that (1) the State failed to prove that he voluntarily, knowingly, and intelligently waived his Fifth Amendment rights enumerated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966); (2) he did not have an opportunity to talk to a lawyer before giving a statement; (3) he did not sign a waiver of rights form; (4) the State failed to lay a proper predicate to show the voluntariness of the statement; (5) there was an insufficient showing that he understood what he was doing when he gave the statement; (6) the facts and circumstances surrounding the taking of the statement suggest that he was offered an inducement or reward, or had been threatened or coerced in order to get him to give a statement; and (7) the trial court erroneously prevented defense counsel from fully cross-examining Officer Lynn as to the reason appellant, after denying involvement in the incident, changed his mind and made an incriminating statement.
The evidence presented at the pre-trial suppression hearing disclosed that as a result of the information furnished by Bertha Thomas, Officers Williams and Miley of the Dothan Police Department commenced looking for appellant. They found him around 10:40 p.m. as he was about to enter Newsome's Drive-In in Dothan, and told him that they wanted to talk with him, and asked him to go "downtown." He replied, "Okay," and opened the back door of the police car. The officers "patted him down" for weapons and discovered an unfired 12-gauge shotgun shell in his jacket pocket. When appellant entered the police car, and before the officers told him what they wanted to talk with him about, he commenced telling them that he had nothing to do with the man getting killed and he offered an alibi. Williams interrupted appellant, saying, "Let me read you your rights before you go to talking." Williams said that he stopped the police car and read and explained appellant's Miranda rights to him. Williams said he did not remember *Page 135 
whether he asked appellant if he understood his rights. Miley testified, without objection, that in his opinion, appellant understood the Miranda rights read to him. After he read appellant's rights to him, Williams asked appellant if he was involved in the shooting and he denied any involvement, continuing to give an alibi. The officers testified that, when they picked appellant up, they could tell that he had been drinking, but that he was not intoxicated. Miley stated that he could smell alcohol on appellant and he was slurring his words "just a little bit," but he was not staggering drunk. Miley further testified that appellant was not so intoxicated that he was unaware of what he was talking about.
Appellant, Williams, and Miley arrived at the police station around 10:45 to 11:00 p.m. Williams asked appellant again if he was involved and he continued denying involvement. Williams told Captain Stokes that appellant had been advised of hisMiranda rights. Captain Stokes talked with appellant and told him that he had been seen carrying a shotgun in the vicinity of the shooting near the railroad tracks. Appellant denied being near the tracks with a gun and claimed he had been at someone's house that afternoon, but he could not remember the person's name. Officer Lynn, being advised that appellant's Miranda
rights had been given him by Williams, took over the questioning of appellant around midnight. Lynn swabbed appellant's hands for possible traces of gunshot residue, and talked with him about his possible involvement in the shooting. At first appellant denied any involvement, but then admitted shooting Norris and taking his wallet. He was then booked and charged with the crime. This threshold oral admission made to Lynn was not recorded, and was not offered into evidence by the State.
After this threshold admission, appellant was again advised of his Miranda rights, this time by Lynn, at 1:38 a.m., April 11, 1981; he signed a waiver of rights form; and then he gave a detailed statement, which was taped. Lynn read and explained the waiver form to appellant before he signed it. The waiver contained a statement that appellant understood his rights, was willing to make the statement, understood what he was doing, did not want a lawyer, and was not coerced by any threats or pressure of any kind. The taping of this statement, which we refer to as the "first taped statement," began at 1:40 a.m. in the presence of Lynn and Officer Locke and was apparently completed in approximately 95 minutes. Lynn testified that appellant had been drinking, but that, in his opinion, he was not "high" and understood what he was doing. Later that morning, after daybreak, appellant went with Lynn and Williams and showed them where he had hidden the shotgun beside the railroad tracks, and it was recovered. Williams testified that after returning to the police station, appellant talked with his mother in Williams's presence. She asked appellant if he killed the man, and he told her that he did. At 11:05 a.m., Lynn, in the presence of Williams, advised appellant of hisMiranda rights again, obtained his signature on a waiver of rights form, and took another taped statement from appellant, which we refer to as the "second taped statement." Williams stated that the purpose of taking this statement was to see if there was any variance from the first one. Lynn testified that at no time was appellant offered any inducement or hope of reward or threatened or coerced in any way in order to obtain any of the statements.
A confession is prima facie involuntary and inadmissible, and the State must show voluntariness and a Miranda predicate in order to admit it. Thomas v. State, 373 So.2d 1167 (Ala. 1979), vacated on other grounds, 448 U.S. 903 (1980); Lewis v. State,295 Ala. 350, 329 So.2d 599 (1976). Whether a waiver is voluntarily, knowingly, and intelligently made depends upon the particular underlying facts and circumstances of each case, including the background, experience, and conduct of the accused — the totality of the circumstances. Thomas v. State;Wright v. State, 340 So.2d 74 (Ala. 1976); Chandler v. State,426 So.2d 477 (Ala.Crim.App. 1982) (citing Edwards v. Arizona,451 U.S. 477, *Page 136 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)); Myers v. State, 401 So.2d 288
(Ala.Crim.App. 1981), and cases cited therein. The question of whether a confession or inculpatory statement was voluntarily made is one of law, to be determined by the trial judge.Marschke v. State, 450 So.2d 177 (Ala.Crim.App.), cert. denied,450 So.2d 177 (Ala. 1984); Myers v. State. The finding of the trial judge will not be disturbed on appeal unless it appears contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State; Minor v. State, 437 So.2d 651
(Ala.Crim.App. 1983); Balentine v. State, 339 So.2d 1063
(Ala.Crim.App.), cert. denied, 339 So.2d 1070 (Ala. 1976). The trial court need only be convinced from a preponderance of the evidence to find a confession or inculpatory statement to have been voluntarily made. Harris v. State, 420 So.2d 812
(Ala.Crim.App. 1982); Myers v. State.
For purposes of this appeal, we will assume that appellant was in custody from the moment he was picked up by the police for the purpose of bringing him to the police station and throughout the time of the giving of all the statements. The trial court, in its findings of fact, found that appellant was taken into custody by the officers at the time he was initially picked up. There is no question that the officers had probable cause to arrest appellant at the time.
Appellant's initial unsolicited statements in the police car, made before being advised of his Miranda rights and before he knew what the officers wanted to talk with him about, in which he denied involvement in the killing, were certainly not in his interest, and cast suspicion upon him. Nevertheless, these statements were admissible. A spontaneous statement, blurted out by an accused and volunteered to a police officer prior to any questioning, is admissible against him even though he was not given Miranda warnings. Crawford v. State, 479 So.2d 1349
(Ala.Crim.App. 1985); Zeigler v. State, 435 So.2d 156
(Ala.Crim.App.), cert. denied, 435 So.2d 156 (Ala. 1983);Hammons v. State, 371 So.2d 986 (Ala.Crim.App. 1979); Espy v.State, 365 So.2d 356 (Ala.Crim.App. 1978). "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Miranda v. Arizona,384 U.S. at 478, 86 S.Ct. at 1629.
When appellant first began talking in the police car, Officer Williams stopped the car and read appellant his Miranda rights and explained them to him. After arriving at the police station, Captain Stokes and Williams briefly questioned appellant further, and then Officer Lynn took over. After denying involvement at first, appellant admitted to Lynn that he shot Norris and took his wallet. This is the threshold admission referred to above, which was not recorded and never introduced or admitted into evidence.
Appellant contends that the State failed to show the required "knowing and intelligent" waiver of his constitutional rights which were read to him by Williams. He contends that this failure to show the required waiver rendered the initial questioning of appellant by Lynn improper, and the incriminating admissions elicited thereby inadmissible. He further argues that since the incriminating threshold admission made to Lynn was tainted, the subsequent statements which were taped and admitted into evidence during the trial were inadmissible under the "fruit of the poisonous tree" doctrine. Appellant apparently bases his argument on the fact that he never expressly stated that he wished to waive his Miranda
warnings given him by Williams or expressly stated that he understood them. Williams could not recall whether appellant stated that he understood his rights and waived them. He did not remember whether he asked appellant if he understood and waived his rights. Miley gave his opinion, without objection, that appellant understood his constitutional rights. There is no direct evidence that appellant expressly waived his rights after they were read to him by Williams, and we are therefore relegated to the question of whether appellant's background, experience, *Page 137 
and conduct, when taken together with the statement of hisMiranda rights that were read by Williams, are sufficient to show a knowing and intelligent waiver of his rights.
While all extrajudicial confessions are prima facie involuntary and can be rendered admissible only by a showing that an "express and affirmative" waiver was given, there is no set pattern or manner for a waiver. Sullivan v. State,351 So.2d 659 (Ala.Crim.App.), cert. denied, 351 So.2d 665 (Ala. 1977); Lloyd v. State, 45 Ala. App. 178, 227 So.2d 809 (1969). While a waiver will not be presumed simply from the silence of the accused after the warnings are given or simply from the fact that a confession was obtained, where the totality of the circumstances indicate that the confession was voluntary, a confession will not be excluded because the accused did not state that he understood his rights or did not sign a written waiver. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755,60 L.Ed.2d 286 (1979), and cases cited therein. In Sullivan v.State, 351 So.2d at 664, this court stated:
 "Any clear manifestation of a desire to waive is sufficient. The test is a showing of a knowing intent, not the utterance of a shibboleth. The criterion is not solely the language but a combination of that articulation and the surrounding facts and circumstances. Lloyd, 45 Ala. App. at 184, 227 So.2d at 814."
In North Carolina v. Butler, 441 U.S. at 373-76,99 S.Ct. at 1757-59, the United States Supreme Court stated:
 "An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights. The courts must presume that a defendant did not waive his rights; the prosecution's burden is great, but in at least some cases, waiver can be clearly inferred from the actions and words of the person interrogated.
". . .
 ". . . Ten of the eleven United States Courts of Appeals and the courts of at least seventeen states have held that an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the Miranda case." (Footnotes omitted.)
We turn now to an examination of the circumstances of the present case to determine whether appellant, in fact, knowingly and voluntarily waived his rights. The record shows that Williams read the Miranda rights to appellant and explained them. Before reading appellant his rights, Williams stopped him from talking, cautioned him, and stopped the police car, thus directing full and undistracted attention to the reading of the rights. Appellant was not subjected to exhausting interrogation over an extended period; the incriminating threshold admissions were made to Lynn within 2 hours of the time appellant was picked up by Williams and Miley. He was not promised anything for his statement, nor was he threatened in any way. Moreover, appellant did not testify in his own behalf at the hearing on the motion to suppress, and his only witnesses were the officers involved in the investigation. He offered no evidence to explain the incriminating statements or to contradict the State's showing of voluntariness. The evidence of voluntariness offered by the State stands unrefuted. There was no suggestion that appellant was mentally deficient, and even though he obviously had been drinking, the evidence showed that he was not under the influence of alcohol to the extent that he did not know what he was *Page 138 
doing and did not know the meaning of his words. Where a suspect who is given a Miranda warning has been drinking, his confession is not thereby rendered inadmissible unless he is unconscious of the meaning of his words. Boggan v. State,455 So.2d 228 (Ala.Crim.App.), cert. denied, 455 So.2d 228 (Ala. 1984); Woods v. State, 54 Ala. App. 591, 310 So.2d 891 (1975). Even though Lynn was not present when Williams advised appellant of his Miranda rights, he was aware that appellant had been so advised and, under the circumstances, was not required to advise him of his rights again before questioning him. There is no requirement that a suspect be informed of his constitutional rights before each separate interrogation, and a determination of whether or not Miranda warnings must be repeated is one that should be made on a case-by-case basis.Tolbert v. State, 450 So.2d 805 (Ala.Crim.App. 1984); Hollanderv. State, 418 So.2d 970 (Ala.Crim.App. 1982). There appeared to be no substantial break in the interrogation process that would require a repeated Miranda warning. Although appellant makes much of the presence of several officers with sidearms at the police station, there is insufficient evidence in the record to support an inference that this intimidated appellant or influenced him in any way in the giving of his statement. There is no evidence that there was a coercive atmosphere at the station and no evidence of physical or psychological coercion, and none was presented by appellant, in the proceedings. At no stage in the proceedings has appellant ever denied that he understood the warnings given him. It is reasonable to conclude that appellant, when confronted with the evidence against him, decided to admit shooting the engineer when confronted with the evidence against him. A review of the totality of the circumstances[3] convinces us that the appropriate constitutional procedures were followed, and that appellant's threshold oral statement to Lynn was voluntary, and made after a voluntary, knowing, and intelligent waiver of his Miranda rights.
After examining the record and considering the totality of the circumstances surrounding the two taped statements of appellant, we also conclude that these statements were voluntarily made, and that appellant made an intelligent, knowing, and voluntary waiver of his Miranda rights. HisMiranda warnings were thoroughly covered and no improper influence, threat, intimidation, inducement, promise, or hope of reward was made to obtain the statements. The record fully established the complete voluntariness of these statements by appellant. An extensive pre-trial hearing was held in this case on the admissibility of the two taped inculpatory statements. Based on the evidence presented during the voluntariness hearing, which we have reiterated above, the trial court ruled that they were admissible, and they were subsequently admitted into evidence at the trial. As we have heretofore stated, the oral threshold statement was never offered. Given the conclusion that the oral threshold statement given to Lynn was voluntary, given after full Miranda warnings, and after a voluntary, knowing, and intelligent waiver of those rights, we hold that it did not taint the subsequent statements or render them "fruit from the poisonous tree." Under the circumstances of the case before us, it does not appear that the trial court abused its discretion, i.e., that its voluntariness determination was contrary to the evidence or manifestly wrong. Thus, from all the facts and circumstances, we hold that the trial court correctly admitted the statements.
Likewise, we hold that the shotgun and other evidence flowing therefrom were not tainted by the initial threshold statement *Page 139 
and, thus, were not "fruit of the poisonous tree," but admissible in evidence.
During the taking of the first taped statement, which, like the second, was made by appellant after proper Miranda
warnings, after acknowledgement of understanding of his rights, after signing a waiver of his rights, and without a trace of evidence that his statement was anything less than the product of his free will, appellant admitted shooting the engineer with a shotgun, admitted ownership of the gun, and told the officers where he had hidden it near the scene. The following morning, after daylight, appellant went with the officers and showed them where the gun was hidden. It was recovered. There is nothing in the record to indicate that the actions of appellant in going with the officers and pointing out the spot where the gun was hidden was anything other than completely voluntary. The actions of appellant closely followed, by only a few hours at most, the giving of the statement describing the gun and its location, which we have found to be fully voluntary.
Assuming, arguendo, the correctness of appellant's contention that his threshold admission was procured in violation of the Fifth Amendment because he did not waive the Miranda warnings initially given him by Williams and he was not again warned of his Miranda rights immediately prior to the threshold admission, he still does not prevail because the two taped statements would be admissible in evidence against him under the rule recently announced by the United States Supreme Court in the case of Oregon v. Elstad, 470 U.S. 298, 105 S.Ct. 1285,84 L.Ed.2d 222 (1985). In resolving this issue, in light ofOregon v. Elstad, we need not determine the correctness of appellant's assertions, and more specifically, we need not determine if appellant impliedly waived his Miranda rights before he made the oral threshold admission to Lynn. Even assuming that the evidence is insufficient to support a finding that he waived those rights, the subsequent taped statements would still be admissible under the circumstances of this case.Oregon v. Elstad holds that the self-incrimination clause of the Fifth Amendment does not require the suppression of a confession made after proper Miranda warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary but unwarned admission from the suspect.
The Court in Oregon v. Elstad, 470 U.S. at 309-318,105 S.Ct. 1293-98, stated:
 "If errors are made by law enforcement officers in administering the prophylactic Miranda procedures, they should not breed the same irremedial consequences as police infringement of the Fifth Amendment itself. It is an unwarranted extension of Miranda to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though Miranda requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.
". . .
 ". . . In these circumstances, a careful and thorough administration of Miranda warnings serves to cure the condition that rendered the unwarned statement inadmissible. The warning conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an `act of free will.' Wong Sun v. United States, 371 U.S., at 486, 83 S.Ct. at 416.
". . .
 ". . . When neither the initial nor the subsequent admission is coerced, little justification exists for permitting the highly probative evidence of a voluntary confession to be irretrievably lost to the factfinder.
". . . *Page 140 
 ". . . We must conclude that, absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion. A subsequent administration of Miranda
warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement. In such circumstances, the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights.
". . .
 ". . . We hold today that a suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite Miranda warnings."
In the instant case, the reading of appellant's rights prior to the taking of the two taped statements, which were subsequently admitted into evidence, was thorough and complete. Appellant signed a statement on each occasion acknowledging the reading of the rights, and stating that he understood them and expressly waived them. There is no question that he knowingly and voluntarily waived his right to remain silent and his right to counsel in each instance before he described his actions in the killing of the engineer, Norris. Appellant's earlier oral threshold admission, which he claims was unwarned and made without a prior waiver, and therefore tainted, was clearly voluntary within the meaning of the Fifth Amendment. There is no evidence in the record showing any deliberate coercion or improper tactics in the obtaining of the initial threshold statement. No evidence was presented showing any physical abuse, deprivation of food or rest, or uninterrupted questioning for prolonged periods. There is no evidence to indicate that there were circumstances surrounding the questioning which were calculated to undermine appellant's ability to exercise his free will. We find that neither the environment nor the manner of interrogation was coercive. There is no evidence that the officers exploited the initial threshold admission to pressure appellant into waiving his right to remain silent. We conclude that the initial or threshold admission, which appellant argues was unwarned, and without valid waiver, was made freely, voluntarily, and without compulsion or inducement of any sort. The threshold admission was not introduced into evidence. Since it was voluntary, it did not "taint" the subsequent statements obtained pursuant to sufficient Miranda warnings and voluntary and knowing waivers. The ruling of the trial court in admitting the two taped admissions into evidence was therefore proper and due to be sustained.
The confession of appellant to his mother at the police station in response to her question, asking him if he killed the engineer, was also admissible in evidence. Miranda warnings are not required in instances where inculpatory or otherwise admissible statements are made to persons who are not law enforcement officers or their agents. Warrick v. State,460 So.2d 320 (Ala.Crim.App. 1984); Hinshaw v. State, 398 So.2d 762
(Ala.Crim.App.), cert. denied, 398 So.2d 766 (Ala. 1981); Terryv. State, 397 So.2d 217 (Ala.Crim.App.), cert. denied,397 So.2d 223 (Ala. 1981). Appellant's mother was not a law enforcement officer nor the agent of one.
Appellant further claims that the trial judge erroneously prevented him from bringing out, during cross-examination of Officer Lynn, the reason or reasons why appellant, after denying any involvement in the killing, changed his mind and implicated himself. He claims that the error occurred when the trial judge sustained an objection to a question directed to Lynn as to why appellant changed his mind. The record shows the following:
 "Q. Okay, so, you went into detail about evidence you had against him even though he had denied any involvement *Page 141 
and that is why he changed his story and gave you a statement?
 "MR. SORRELLS: (prosecuting attorney): We object. He'd have to look inside his head to know why he did it.
 "THE COURT: Okay, I — if you're asking as to his reasoning, I sustain."
After the objection was sustained by the trial court, appellant did not pursue that line of questioning further. Appellant's counsel had previously asked Lynn what he had told appellant to get him to change his mind, and Lynn had answered by saying, "Just normal questions and explaining to him the evidence we had against him." Lynn could not know what was in appellant's mind and what motivated him in changing his mind. A witness may not testify to the uncommunicated mental operation or intent of another. Flanagan v. State, 369 So.2d 46 (Ala.Crim.App. 1979). Testimony of a witness as to what others believed is not admissible. Shadle v. State, 280 Ala. 379, 194 So.2d 538
(1967); McAdams v. State, 378 So.2d 1197 (Ala.Crim.App. 1979).
Since the question asked of the State's witness, Lynn, on cross-examination called for testimony as to the mental operations of another, that objection was properly sustained.
 II
Appellant contends that the trial judge committed reversible error when he admitted into evidence, over timely objection, several photographs of the victim's body and a photograph of a window in the train engine showing blood and pieces of flesh. He argues that the photographs were extremely gruesome, were intended to influence and prejudice the jury, and their introduction was unnecessary since the State had witnesses who could adequately describe the scene without the use of photographs. He claims that the photographs so prejudiced him in the eyes of the jury that it amounted to a denial of his fundamental right to a fair trial.
As a general rule, photographs are admissible in evidence if they tend to prove or disprove some disputed or material issue, to illustrate or elucidate some other relevant fact or evidence, or to corroborate or disprove some other evidence offered or to be offered, and their admission is within the sound discretion of the trial judge. Fletcher v. State,291 Ala. 67, 277 So.2d 882 (1973); Hopkins v. State, 429 So.2d 1146
(Ala.Crim.App.), cert. denied, 429 So.2d 1146 (Ala. 1983);Godbolt v. State, 429 So.2d 1131 (Ala.Crim.App. 1983);Carpenter v. State, 400 So.2d 417 (Ala.Crim.App.), cert. denied, 400 So.2d 427 (Ala. 1981). Photographs which depict the character and location of external wounds on the body of a deceased are admissible even though they are cumulative and based upon undisputed matters. Wicker v. State, 433 So.2d 1190
(Ala.Crim.App. 1983); Hopkins v. State; Hines v. State,365 So.2d 320 (Ala.Crim.App.), cert. denied, 365 So.2d 322 (Ala. 1978). The fact that a photograph is gruesome and ghastly is no reason to exclude its admission into evidence, if it has some relevancy to the proceedings, even if the photographs may tend to inflame the jury. Warrick v. State, 460 So.2d 320
(Ala.Crim.App. 1984); Carpenter v. State; Richards v. State,337 So.2d 171 (Ala.Crim.App.), cert. denied, 337 So.2d 173
(Ala. 1976).
We have examined the photographs in this case in the light of the principles set out above, and find that the trial judge did not abuse his discretion in admitting them into evidence. The photographs depicted, among other relevant and material facts, the location of the gunshot wound and the direction and angle from which the gun was fired. The photographs shed light on the location and activities of the engineer, as well as his assailant, at the time the shot was fired. These matters were highly relevant to the issues in the case. The photographs objected to were properly admitted. We also find that they were properly authenticated.
 III
Appellant contends that the trial court committed reversible error in permitting *Page 142 
Officer Lynn to testify as to what appellant told him when giving the second taped statement. We note that Lynn also testified as to what appellant told him when giving the first taped statement. The taped statements had been transcribed, but the typed transcriptions were never introduced into evidence. Likewise, the tapes were never introduced into evidence. Only the oral testimony of Lynn of what appellant told him on each occasion was offered and admitted.
The Supreme Court of Alabama, when confronted with a similar situation in Elkins v. State, 250 Ala. 672, 674, 35 So.2d 693,695 (1948), stated:
 "Here we have an inculpatory admission which was extrajudicial, taken down in writing and signed by the accused. From our examination of the authorities while there is some diversity of opinion (22 C.J.S. Criminal Law § 833, page 1457), the rule which we prefer to follow is well established, viz. that parol evidence of a confession or inculpatory statement taken down in writing extrajudicial is not secondary evidence. It could well be that the written evidence would be more convincing and accordingly of greater weight but that is not the determining factor. Both the written statement and the oral testimony of a witness who heard the statement are classed as primary evidence. The rules governing the establishment of a contract have no application here. Where there is a contract there is a meeting of minds and the written words are presumed to embrace the final agreement to the exclusion of everything else. When a confession or inculpatory statement is made there is no meeting of minds. All that the accused voluntarily wrote or said which is material to the charge, is competent against him because it is his own admission and against his own interest. The witness testifies not as to what the writing contains, but as to what he heard the defendant say. The court was not in error in allowing parol evidence of the statement made by the accused. . . ."
See Gwin v. State, 425 So.2d 500 (Ala.Crim.App. 1982), writ quashed, 425 So.2d 510 (Ala. 1983); Parker v. State,337 So.2d 1378 (Ala.Crim.App. 1976); Sperling v. State, 57 Ala. App. 583,329 So.2d 641 (1976); C. Gamble, McElroy's Alabama Evidence § 200.19 (3d ed. 1977).
The typed transcriptions, taped sound recordings, and the oral testimony of the witness who heard the statements are classed as primary evidence. Any one of the three could have been admitted. Thus, it appears that the oral testimony of the witness, Lynn, in reference to appellant's inculpatory admissions, was admissible as primary evidence. We point out that appellant had copies of the transcriptions, and could have introduced them had he desired. He had them available for cross-examination, and could have brought out any part of the statement omitted by Lynn. It appears that Lynn's testimony in reference to the statements was substantially complete and omitted nothing material.
 IV
Appellant contends that the trial court committed reversible error in allowing into evidence, over timely objection, the following items: (1) A photograph of the victim's wallet and contents (State's Exhibit 10); (2) a bag containing the wallet and contents (State's Exhibit 13); (3) a fingerprint card containing appellant's known fingerprints (State's Exhibit 14); and (4) a card containing appellant's known palm prints (State's Exhibit 15). One basis of his contention is that due to the victim's wallet and contents thereof not being discovered until 2 to 4 hours after the crime scene had been secured by the police, there was a possibility that someone had tampered with them. Another basis of his contention is that the State failed to establish a proper chain of custody for the items of evidence listed above. He further contends that it was error for the trial court to allow the fingerprint examiner, Carol Curley, to testify regarding the comparisons she made between the latent fingerprint and palm print lifted from items in the *Page 143 
victim's wallet (State's Exhibit 13), and appellant's known fingerprints (State's Exhibit 14) and known palm prints (State's Exhibit 15) due to the State's failure to establish a proper chain of custody of the exhibits and the possibility that someone could have tampered with the wallet and its contents.
The engineer's body was discovered within a few minutes after he was shot. One of his rear pants pockets was turned inside out, and his wallet was missing. Within 3 or 4 hours after the police arrived at the scene, the wallet and its contents were found in the grass, near the tracks, at the rear of Dothan Feed and Seed, between 1/4 and 1/2 mile up the tracks from where the train stopped. The wallet apparently was found in an area not generally frequented by the public. Appellant's fingerprint and palm print were found on items from the wallet, and appellant admitted to the police that he threw the wallet in the area where it was found. The record reflects that the actions of the police in securing the area where the crime was committed, and in gathering and preserving the evidence, were thorough, systematic, and efficient. Under these circumstances it is highly unlikely that anyone tampered with or disturbed the wallet and its contents from the time it was apparently discarded by the assailant until it was found by the police. Appellant's averment of tampering is pure speculation, and there is not the slightest bit of evidence to support it. Appellant offered no explanation or theory as to how his prints could have gotten on the cards in any other way except by his own actions. There is no merit in appellant's contention that the wallet and its contents should be excluded on this basis.
Appellant argues that the chain of custody established for the above evidence was deficient. We disagree.
It was established at trial that Officer Tommy Martin found the wallet, but did not touch it. Officer David Kirkland, in Martin's presence, photographed the wallet, then picked up the wallet and its contents, put them in an evidence bag, and turned them over to Officer Lynn in the same condition in which they were found. Lynn turned the wallet and its contents, in a sealed plastic bag, over to Joe Saloom of the Alabama Department of Forensic Sciences. Saloom turned the bag containing the wallet and its contents over to Charles Brooks, laboratory administrator at the Enterprise laboratory of the Alabama Department of Forensic Sciences. Brooks mailed the bag containing the wallet and its contents, sealed in a manila envelope, to the Alabama Bureau of Investigation. The envelope containing the wallet and its contents was received at the Alabama Bureau of Investigation by Carol Curley, certified latent print examiner. When she received the envelope, it was sealed with evidence tape bearing Brooks's initials, and the evidence tape sealing the package was cut in Curley's presence. When Curley finished examining the wallet and its contents, she mailed them back to Brooks. Brooks received the items and returned them to Lynn. When the items were returned to Brooks, they were in the same condition as when they were mailed to the Alabama Bureau of Investigation. When the items were received back from Brooks by Lynn, they were in the same condition as when he turned them over to Saloom, with the exception that paper items from the wallet had been sprayed with a substance to raise fingerprints, causing some discoloration. The items were then introduced into evidence through Lynn. Sergeant Frank Meadows of the Houston County Sheriff's Department, as part of routine procedure, took appellant's fingerprints on April 11, 1981, and Meadows and appellant both signed the fingerprint card. And except for some markings made on the card by someone else, the card as produced at trial was in the same condition as when the prints were taken by Meadows. On June 5, 1981, Lynn took appellant to the Sheriff's Department to have some palm prints made, and the palm prints were made in Lynn's presence. At the trial the sheets containing the palm prints were in the same condition as when they were made with the exception of a case number having *Page 144 
been subsequently put on the sheets. Curley testified that the fingerprint card introduced at trial (State's Exhibit 14) and the palm print sheets introduced at trial (State's Exhibit 15) were used by her in comparing appellant's fingerprints and palm prints with the latent fingerprint and palm print found on the items from the engineer's wallet, and that the fingerprint card and palm print sheets were in the same condition at trial as they were when she used them to make her print comparisons.
In Sexton v. State, 346 So.2d 1177, 1180 (Ala.Crim.App.), cert. denied, 346 So.2d 1180 (Ala. 1977), this court stated:
 "To warrant the reception of an object in evidence against an objection that an unbroken chain of custody has not been shown, it is not necessary that it be proved to an absolute certainty, but only to a reasonable probability, that the object is the same as, and not substantially different from, the object as it existed at the commencement of the chain." (Citations omitted.)
The purpose of establishing a chain of custody is to show a reasonable probability that there has been no tampering with the item of evidence. Franklin v. State, 424 So.2d 1353
(Ala.Crim.App. 1982), cert. denied, 424 So.2d 1353
(Ala.Crim.App. 1983); Bell v. State, 339 So.2d 96
(Ala.Crim.App. 1976). In passing upon the admissibility of such evidence, "the trial judge should consider the nature of the article and the circumstances surrounding its preservation and custody," and permit its introduction where continuity of possession is "sufficiently established to afford ample assurance of . . . authenticity." Washington v. State, ,339 So.2d 611, 615 (Ala.Crim.App.), cert. denied, 339 So.2d 616
(Ala. 1976) (citations omitted).
In the instant case, "an accounting was made of each successive step in the handling of the evidence." Lowery v.State, 452 So.2d 897, 898 (Ala.Crim.App. 1984). The identification and continuity of possession were sufficiently shown to afford ample assurance of authenticity. The items of evidence set out above were properly admitted.
It should be noted that the officers who prepared the prints, latent and known, identified them at trial, and testified that they were in substantially the same condition as when they were first taken. The fingerprint expert identified them as the ones she used in her comparisons. Evidence of fingerprints is capable of eyewitness identification, and it is a sufficient foundation for the introduction of such evidence that a witness identifies it and it has relevance to the issues of the case. Under these circumstances it is not necessary to establish a complete chain of custody. Richardson v. State, 354 So.2d 1193
(Ala.Crim.App. 1978); Stewart v. State, 347 So.2d 562
(Ala.Crim.App. 1977); People v. Thibudeaux, 98 Ill. App.3d 1105, 54 Ill.Dec. 275, 424 N.E.2d 1178 (1981); Hoskins v. State,441 N.E.2d 419 (Ind. 1982); Commonwealth v. LaCorte, 373 Mass. 700,369 N.E.2d 1006 (1977); State v. Beck, 286 S.E.2d 234 (W.Va. 1981). Chain of custody requirements do not apply with the same force to items of evidence which are unique and identifiable in themselves. State v. Beck. The fingerprint and palm print exhibits introduced in evidence in this case squarely fall into the category of evidence unique and independently identifiable.
Having determined that the State established a proper chain of custody for the above evidence, that the evidence was properly identified by eye witnesses, and that appellant's allegation that someone could have tampered with the wallet and its contents was without merit, we find that the trial court was not in error in overruling appellant's objection to the testimony of the fingerprint examiner, Curley, regarding the fingerprint and palm print comparisons. Appellant produced no evidence that the prints were not authentic or had been tampered with. The trial judge properly admitted the prints. The weight to be given the evidence of the correspondence of fingerprints and palm prints, where offered to prove the identity of the *Page 145 
accused as the person committing a crime, is for the determination of the jury in the light of all the surrounding facts and circumstances. Nichols v. State, 462 So.2d 992
(Ala.Crim.App. 1984), cert. denied, 462 So.2d 992 (Ala. 1985);James v. State, 381 So.2d 672 (Ala.Crim.App. 1980).
 V
Appellant contends that reversible error was committed by the trial court in overruling his objection to the testimony of the fingerprint expert, Curley, on the ground that she did not have "diagrams, enlargements, or other appropriate material" to demonstrate to the jury the points of comparison between the latent prints and the known ink-prints of appellant. He argues that the admission of this testimony, without his being able to require the expert to demonstrate the comparisons on enlargements or other appropriate materials, constituted a denial of his constitutional right to confront and cross-examine the witness. He does not contend that the fingerprint examiner lacked the necessary qualifications to give her opinion, and only objects to her inability to demonstrate the points of comparison to the jury due to not having the necessary enlargements and materials with her in court.
The question of the competency of a particular witness to testify as an expert is a matter largely within the sound discretion of the trial court, and this court will not disturb the trial court's ruling unless there has been an abuse of discretion. Merriweather v. State, 364 So.2d 374
(Ala.Crim.App.), cert. denied, 364 So.2d 377 (Ala. 1978); Davisv. State, 33 Ala. App. 68, 29 So.2d 877 (1947); 1 Underhill'sCriminal Evidence § 141 (Jerrick 6th ed. 1973). In the instant case, the record discloses that the fingerprint examiner had 12 years' experience in the field of processing, examining, and comparing prints; had received training from a person who was supervisor of the Latent Print Division of the Federal Bureau of Investigation for 35 years; had received advanced latent print training at the Latent Print School of the Federal Bureau of Investigation; and teaches courses to other officers in fingerprint examination. Clearly a proper predicate was laid in establishing Curley's qualifications, and the trial court did not abuse its discretion in admitting her testimony as a fingerprint and palm print expert. Merriweather v. State; Davisv. State; Leonard v. State, 18 Ala. App. 427, 93 So. 56 (1922); 1 Underhill, supra.
In her testimony, the fingerprint examiner explained how fingerprints occur, how no two persons' prints are alike, how they are processed and developed for examination, how comparisons are made, and the points of similarity required to make a positive identification. She testified that the State required at least nine points of similarity, and the Federal Bureau of Investigation required seven points, in order to make a positive identification. She further testified that in the instant case she found 11 points for identification purposes between the latent fingerprint on the card from the victim's wallet and the known inked fingerprint of appellant, and nine or more points between the latent palm print on the card from the victim's wallet and the known inked palm print of appellant. She positively identified the prints as having been made by the same person, appellant.
A fingerprint expert's testimony is admissible even though the expert does not have enlargements to demonstrate points of comparison. Turner v. State, 235 Ga. 826, 221 S.E.2d 590
(1976). See also McCoy v. State, 237 Ga. 118, 227 S.E.2d 18
(1976); State v. Johnson, 333 So.2d 223 (La. 1976). The weight to be given the testimony of the expert is a question for the jury. It is for the jury to decide whether the evidence is sufficient to establish beyond a reasonable doubt that the prints found on the cards from the wallet were the appellant's, and whether they were placed there at the time of the commission of the crime. State v. Helms, 218 N.C. 592,12 S.E.2d 243 (1940); 1 Underhill, supra, at § 142. The lack of diagrams and enlargements to aid the expert in explaining the fingerprinting process would be for *Page 146 
the jury to consider in weighing the evidence, but would not affect the admissibility of the expert's testimony. The jurors are not required to make an identification of the prints, which they would not be qualified to make as experts even with enlargements. See State v. McMorris, 343 So.2d 1011 (La. 1977). Appellant did not question or cross-examine the expert to attempt to show that her methods were improper. There is no evidence casting any doubt upon her methods.
Based upon the expert's testimony in support of her identifications and the lack of any evidence to show that her methods were improper, we find no error in the admission of the evidence of the fingerprint and palm print identifications. Since the expert was qualified in her field, her testimony was admissible even though she did not have diagrams or enlargements with her in court to demonstrate the points of comparison. We also find that appellant's claim that he was denied his constitutional rights of confrontation and cross-examination due to the expert's not having enlargements or diagrams to demonstrate the points of comparison is without merit.
 VI
Appellant contends that the trial court erred in finding the existence of aggravating circumstances, in finding that the aggravating circumstances outweighed the mitigating circumstances, and in failing to find mitigating circumstances other than those specifically found to exist.
The trial court found that the following aggravating circumstances existed: (1) The defendant knowingly created a great risk of death to many persons (§ 13A-5-35 (3)); and (2) the capital offense was committed while the defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery (§ 13A-5-35 (4)).
Appellant contends that there was no "basis in the evidence" to support a finding that appellant knowingly created a great risk of death to many persons. We disagree. The tendency of the evidence is that appellant intentionally shot the engineer from behind without warning while the train was moving backwards, and took his wallet. The engineer obviously fell forward on the throttle and deadman's pedal, thereby causing the train to lurch and accelerate. Appellant even admitted to having had some difficulty jumping from the train due to its speed. The act of appellant in shooting the engineer definitely created a situation in which many persons could have been killed had it not been for the brave act of one of the crewmen, and the fortunate circumstance that no one was crossing the track at Plant Street when the train came through the intersection. If the effort to stop the train had been unsuccessful, the train would have collided with the parked railway cars and very likely a derailment would have occurred. The evidence supports the conclusion that had a derailment occurred, the likelihood of the railcars crashing into the nearby houses and apartments where people lived, causing loss of life to many persons, was real. Moreover, clearly the lives of the conductor and trainman were in jeopardy. It would be illogical to conclude that appellant did not know and recognize, under the circumstances, that leaving pilotless, in a populated area, a moving force having the great weight of this train would create a great risk of death to many persons who happened to be in its path. We find that there was ample evidence to support the finding of the trial court that appellant knowingly created a great risk of death to many persons.
Appellant also contends that there is no evidence in the record to support the finding of the trial court that the capital offense was committed while appellant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit a robbery. We disagree. The evidence in this case in support of the charge of robbery or attempt thereof when the victim is intentionally killed by the defendant is strong and convincing. Ample evidence was presented *Page 147 
for the jury to find appellant guilty of the capital offense beyond a reasonable doubt. The finding of the trial court of the existence of this aggravating circumstance was clearly supported by the evidence.
The State must prove aggravating circumstances "beyond a reasonable doubt." Beck v. State, 396 So.2d 645 at 663 (Ala. 1981). In the case sub judice we find that the State proffered sufficient evidence to meet this burden as to both aggravating circumstances found by the court to exist.
The trial court found the existence of the following mitigating circumstances: (1) The age of the defendant (23) at the time of the crime; (2) the defendant was illegitimate, never knew his father, and had never had a father figure in his home or any adult role model for fatherly guidance; (3) the defendant was to a large extent motherless except for his grandmother; (4) the defendant is of borderline intelligence, had a speech impediment, and had difficulty in school; and (5) the defendant has no prior history of violence except for one incident resulting in an assault and battery conviction. Appellant contends that the trial court erred in failing to find certain additional mitigating circumstances.
He first argues that the trial court erroneously failed to find that appellant had no significant history of prior criminal activity. However, the record reflects that appellant had been convicted of burglary in at least three cases, and had been sentenced to the penitentiary for a term of 3 years. In its findings of fact the trial court found that "[a]t the age 17 the Defendant was sent to the penitentiary for three years for burglary."
Appellant also argues that the trial court should have found that he acted under extreme duress or under the substantial domination of another. The record is devoid of any evidence that another person was coercing or dominating appellant at the time of the commission of the crime. He argues that the trial court should have found that he committed the act under the influence of extreme mental or emotional disturbance, and that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. However, the trial court found that the "Defendant's psychiatric evaluation revealed that he does not suffer from a mental disorder, but has an antisocial personality. His mental ability is one category above mild retardation." This finding is fully supported by the evidence. The record does not support appellant's allegation that he acted under extreme mental or emotional disturbance. Neither does the record support his allegation that his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. The trial court was not in error, as contended by appellant, in not finding the mitigating circumstances complained of above.
Appellant also contends that the trial court's determination that the aggravating circumstances outweighed the mitigating circumstances was error and that it was not in accord with and supported by the evidence. Appellant was convicted of violating § 13A-5-31 (a)(2), Code of Alabama (1975), a capital offense. The aggravating circumstance alleged in the indictment constitutes an element of the capital offense, and must be proved beyond a reasonable doubt. Consequently, the jury verdict that the defendant was guilty of committing the capital offense would mean that the State had already established at least one aggravating circumstance. As we have already concluded, the two aggravating circumstances found by the trial court to exist were supported by the evidence beyond a reasonable doubt. The record does not support any other mitigating circumstances other than those found by the trial judge. The trial court found that "either and particularly both of the aggravating circumstances outweigh the mitigating circumstances and that the aggravating circumstances are sufficient to support the death penalty." We agree with the finding of the trial court. There is no merit to these contentions of appellant. *Page 148 
 VII
Appellant contends that the State failed to make out a prima facie case, and consequently, his motion to exclude the evidence, motion for judgment of acquittal, and motion for a new trial should have been granted. He also contends that the trial court erred in refusing to give his written affirmative charges on the same grounds.
In reviewing the sufficiency of the evidence the appellate courts of this state are bound by a number of well established rules.
In deciding whether or not there is sufficient evidence to support the verdict of the jury and the judgment of the trial court, the evidence must be reviewed in the light most favorable to the prosecution. Johnson v. State, 378 So.2d 1164
(Ala.Crim.App.), cert. quashed, 378 So.2d 1173 (Ala. 1979);Cumbo v. State, 368 So.2d 871 (Ala.Crim.App. 1978), cert. denied, 368 So.2d 877 (Ala. 1979); Bass v. State, 55 Ala. App. 88, 313 So.2d 208 (1975). This court must accept as true the evidence introduced by the State and accord the State all legitimate inferences therefrom. Johnson v. State. Conflicting evidence presents a jury question not subject to review on appeal, provided the State's evidence establishes a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Crim.App.), cert. denied, 387 So.2d 283 (Ala. 1980); McBryar v. State,368 So.2d 575 (Ala. 1979); 7 Ala. Digest, Criminal Law, Key No. 1159.3.
The action of the trial court in denying a motion to exclude the evidence, in denying a motion for judgment of acquittal, in refusing to give the affirmative charge, and in denying a motion for a new trial on the grounds of insufficient evidence, must be reviewed by determining whether or not there exists legal evidence before the jury at the time the motions are made or the charges requested, from which the jury by fair inference could find the defendant guilty. Johnson v. State; Thomas v.State, 363 So.2d 1020 (Ala.Crim.App. 1978). In applying this standard, the appellate court will only determine if legal evidence was presented from which the jury could have found the defendant guilty beyond a reasonable doubt. Willis v. State,447 So.2d 199 (Ala.Crim.App. 1983); Thomas v. State.
There is a presumption in favor of the correctness of a jury's verdict, and when the trial judge declines to grant a new trial, that verdict is strengthened on appeal. Willis v.State; Johnson v. State; Tolliver v. State, 50 Ala. App. 654,282 So.2d 92 (1973).
When the evidence raises questions of fact for the jury and such evidence, if believed, is sufficient to sustain a conviction, the denial of a motion to exclude the State's evidence, the denial of a motion for a judgment of acquittal, the refusal to give the affirmative charge, and the denial of a motion for new trial by the trial court do not constitute error. Young v. State, 283 Ala. 676, 220 So.2d 843 (1969);Willis v. State; Duncan v. State, 436 So.2d 883
(Ala.Crim.App.), cert. denied, 436 So.2d 883 (Ala. 1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984);McConnell v. State, 429 So.2d 662 (Ala.Crim.App. 1983). A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this court that it was wrong and unjust. Bridges v.State, 284 Ala. 412, 225 So.2d 821 (1969); Duncan v. State;Johnson v. State.
The crime of robbery when the victim is intentionally killed is a single offense beginning with the act of robbing or attempting to rob and culminating with the act of intentionally killing the victim. The offense consists of two elements, robbing and intentionally killing. Baldwin v. State,372 So.2d 26 (Ala.Crim.App. 1978), aff'd, 372 So.2d 32 (Ala. 1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043,65 L.Ed.2d 1133 (1980). In the case at bar, the trial court correctly instructed the jury on the elements of the capital offense charged. *Page 149 
Appellant particularly argues that the State did not satisfy its burden of proof as to the robbery component of the capital offense. He asserts that the evidence of the victim's back pocket being turned inside out and the wallet being found approximately 1/4 to 1/2 mile from the engine on or near the tracks is insufficient to establish a prima facie case of robbery or attempted robbery. Appellant omits some of the salient facts from his argument. The facts are that the victim is found dead, shot from behind with a shotgun, under such circumstances that it appeared that he had been shot without warning; his wallet is missing; his back pocket is turned inside out; a short time later his wallet, without money, is found along the tracks with its contents scattered; a fingerprint and palm print of appellant are found on two of the cards from the wallet; a witness had seen appellant along the tracks near the scene shortly before the commission of the crime, carrying a shotgun; blood was found on some items of clothing worn by appellant at the time, with the blood being the same type as that of the victim; appellant's shotgun was found near the scene with a spent shell in the chamber; and the admissions of appellant were to the effect that he shot the victim and took his wallet. Appellant's admissions concerning the wallet are conflicting. In his first taped statement he states that the wallet "fell out," and he picked it up and threw it back on the tracks. In his second taped statement he says that after shooting the engineer, he got the billfold and ran, and later threw it away. He claimed he never looked inside the wallet, but in his first statement, when asked if there was money in it, he answered, "None."
Circumstantial evidence may afford satisfactory proof of the corpus delicti, and, if facts are presented from which the jury may reasonably infer that the crime has been committed, the question must be submitted to the jury. McCloud v. State,401 So.2d 314 (Ala.Crim.App. 1981); Dolvin v. State, 391 So.2d 133
(Ala.Crim.App. 1980).
We find that the corpus delicti of the crime charged was established independently of appellant's admissions. The facts set forth above, without the admissions, are certainly sufficient to support a reasonable inference that Norris was intentionally killed during a robbery in which his wallet was taken, due to the criminal agency of someone. The State having proved the corpus delicti by independent evidence, the admissions of appellant served to prove his participation in, and his guilt of, the crime for which he was convicted.
The trial court correctly charged the jury on the elements of the capital offense of robbery or attempt thereof when the victim is intentionally killed. It charged the jury in part as follows:
 "To sustain the charge in the indictment of intentional killing during a robbery, the State, by the evidence, must prove beyond a reasonable doubt each of the following elements of the offense. First, that the Defendant, Kenneth Earl Magwood, committed or attempted to commit theft of one wallet; second, that in the course of committing or attempting to commit the theft or in immediate flight after the attempt or commission the Defendant either used force or threatened the imminent use of force against the person of Eugene L. Norris with the intent to overcome his physical resistance or physical power to resist or to compel acquiescence to the taking of or escaping with the property; third, that the Defendant was armed with a deadly weapon or a dangerous instrument; and fourth, that while engaged in such the Defendant intentionally killed Eugene L. Norris by shooting him with a shotgun."
The trial court also correctly instructed the jury as to the definition of an intentional act, an attempt, robbery, and theft of property.
After examining the evidence, and applying the proper standards of review, we find that there was sufficient evidence presented by the State to allow the jury to conclude beyond a reasonable doubt that appellant was guilty of the crime charged *Page 150 
in the indictment, "robbery or attempt thereof when the victim is intentionally killed by the defendant." § 13A-5-31 (a)(2). Appellant's contention in his taped statements that the gun accidentally discharged during a scuffle with the victim is discredited by the evidence. The fact that the train suddenly gained speed when the engineer was shot disproves appellant's contention that he "scuffled" with the engineer. If a scuffle had taken place as described by appellant, the engineer would have most certainly taken his foot off the deadman's pedal, automatically stopping the train. The written findings of fact by the trial judge that "the defendant, Kenneth Earl Magwood, intentionally killed Eugene L. Norris in the course of robbing Eugene L. Norris," as well as the verdict of the jury, were amply supported by the evidence.
Accordingly, appellant's motions to exclude the State's evidence, for a judgment of acquittal, and for a new trial, as well as his requested affirmative charges, all based on the assertion of insufficient evidence or the failure of the State to prove a prima facie case, were properly denied or refused.
 VIII
Appellant contends that the Alabama Death Penalty Statute under which he was convicted, Act. No. 213, Reg.Sess. of 1975, Acts of Alabama, p. 701, approved September 9, 1975, §13A-5-30, et seq., Code of Alabama 1975, had been declared unconstitutional prior to his conviction thereunder by the United States Supreme Court in Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), thus rendering his conviction invalid. In Beck v. Alabama, the Court determined that a death sentence may not be imposed after a jury verdict of guilty of a capital offense when the jury is not permitted to consider a verdict of guilt of a lesser included offense, where the evidence would have supported such a verdict. The Court held the so-called preclusion clause of the Act, which precludes the trial judge from giving lesser included offense instructions in capital cases, constitutionally infirm. The Alabama Supreme Court addressed this contention of appellant inBeck v. State, 396 So.2d 645 (Ala. 1981), holding that capital punishment is not unconstitutional per se, and that the constitutionally infirm preclusion clause could be severed from the Death Penalty Statute, thereby preserving the remainder of the statute, which would be complete within itself, sensible, and capable of execution. The reconstruction of the 1975 Death Penalty Law was constitutional; thus the prosecution of appellant under the law was not error. Boggan v. State,455 So.2d 228 (Ala.Crim.App.), cert. denied, 455 So.2d 228 (Ala. 1984).
Appellant further contends that the procedural changes made by the Alabama Supreme Court in the method of sentencing one convicted of a capital offense from those specifically provided by statute constitutes an unconstitutional usurpation of legislative authority and violates the doctrine of separation of powers guaranteed by the federal and state constitutions. The Supreme Court decided this issue in Beck v. State, holding that, under the separation of powers doctrine, it could not change the offense, but that a change in procedure to comport with constitutional requirements was not impermissible. Beck, 396 So.2d at 662. In Clisby v. State, 456 So.2d 95 (Ala. 1983), aff'g 456 So.2d 86 (Ala.Crim.App. 1981), cert. denied,470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985), the court held that all actions taken by the Alabama Supreme Court in Beck v.State were constitutional. Beck v. State, 485 So.2d 1207 (Ala. 1985). See also Raines v. State, 429 So.2d 1111 (Ala. 1982);Colley v. State, 436 So.2d 11 (Ala.Crim.App. 1983).
We find no merit in these contentions of appellant.
 IX
The scope of our review in death cases is set out in A.R.A.P. 45A, as follows:
 "In cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect *Page 151 
in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
We have followed this standard of review in the instant case and have found no plain error or defect in the proceedings.
In reviewing appellant's death sentence by the three-tiered analysis of Beck v. State, we make the following findings: First, appellant was convicted of robbery when the victim was intentionally killed by the appellant, in violation of § 13A-5-31 (a)(2), Code of Alabama 1975 (Blue Paperback Pamphlet 1978) (repealed 1981). This offense is, by statutory definition and designation, a capital offense. Second, we take judicial notice that similar crimes are being punished capitally throughout this state. See, e.g., Beck v. State, 396 So.2d at 654, n. 5 (two-thirds of death sentences imposed in Alabama are in robbery-murder cases); Bush v. State, 431 So.2d 555
(Ala.Crim.App. 1982), aff'd, 431 So.2d 563 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983);Raines v. State, 429 So.2d 1104 (Ala.Crim.App.), aff'd,429 So.2d 1111 (Ala. 1982). And, third, our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in this case. In weighing the aggravating and mitigating circumstances, we believe that the aggravating circumstances far outweigh the mitigating circumstances, and we concur in the findings of the jury and the trial court that death is the appropriate sentence in this case. We also concur in the trial court's finding that either of the aggravating circumstances outweighs the mitigating circumstances. We find that no errors were committed during the sentencing phase hearings which adversely affected the substantial rights of appellant.
Notwithstanding the fact that the crime occurred before July 1, 1981, the effective date of the 1981 Act, we choose to also review appellant's sentence by the provisions of § 13A-5-53, Code of Alabama 1975. Our findings above fully comply with §13A-5-53 (a). In compliance with § 13A-5-53 (b), we find that: (1) There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) our independent weighing of the aggravating and mitigating circumstances convinces us that the sentence of death is appropriate in this case; and (3) considering the crime committed and the defendant, the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases.
We have carefully searched the record in this case for error, as required by law, as to both the guilt and sentencing phases of appellant's trial, and we have found no error harmful to the substantial rights of appellant. Accordingly, appellant's conviction and sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur.
[1] This section as it appears in Blue Supplement is a recodification of § 13-11-2 (a)(2), Code of Alabama (1975). The Alabama Legislature repealed § 13A-5-31 (a)(2) on July 1, 1981; however, the act provides that the repeal of § 13A-5-31 (a)(2) does not affect the application of pre-existing law to conduct occurring before the effective date of the act. Acts 1981, No. 81-178, §§ 19, 20.
[2] The trial court's sentencing order setting out written findings as to aggravating and mitigating circumstances, and written findings of facts summarizing the crime and appellant's participation in it, is attached hereto, made a part hereof, and marked Appendix A.
[3] Although the record reveals that appellant was 23 years of age at the time the statement was made and that he had had some prior experience with the police, we did not consider these facts in our review of the totality of the circumstances because they were not presented during the suppression hearing, but during the sentencing hearing, and thus were not before the trial court during the trial.
 APPENDIX A IN THE CIRCUIT COURT OF HOUSTON COUNTY, ALABAMA. CRIMINAL DIVISION STATE OF ALABAMA, PLAINTIFF, VS. KENNETH EARL MAGWOOD, DEFENDANT. CASE ACTION NO. CC-81-303 SENTENCING ORDER WITH FINDINGS OF FACT
The indictment in this case charged the Defendant, Kenneth Earl Magwood, with having committed a robbery wherein Eugene L. Norris was the victim and with having intentionally killed Eugene L. Norris in the course of such robbery, a capital felony under Sec. 13A-5-31a (2) of the Code of Alabama. The trial jury on September *Page 152 
15, 1982, returned a verdict finding the Defendant, Kenneth Earl Magwood, guilty of the capital felony offense of intentional killing during the course of a robbery as charged in the indictment and on such date further returned an advisory verdict recommending to the Court that the penalty be death. The Defendant was thereby adjudged guilty of intentional killing during the course of a robbery as charged in the indictment.
The Court ordered a presentence investigation and provided copies of the report thereon to the Defendant and to his counsel. A psychiatric evaluation of the Defendant had been ordered and conducted previous to the trial.
A sentencing hearing was held before the Court on September 30, 1982. At the conclusion of such hearing it was the determination and finding of the Court that the aggravating circumstances in this case outweighed the mitigating circumstances in this case and the Court, in making such determination and in considering recommendation of the jury contained in its advisory verdict, fixed the Defendant's punishment at death.
 FINDINGS OF FACT FROM THE TRIAL
The Court makes the following findings of fact from the testimony and evidence presented at the trial:
On April 10, 1981, at approximately 7:30 P.M., two employees of the Southern Railroad Company, Danny Pelham and Jimmy Carroll, found train engineer, Eugene L. Norris, also an employee of the Southern Railroad Company and a member of their three man crew, lying in a pool of blood in the cab of one of the three engines on their train. The victim's left hip pocket appeared to have been pulled out as if his billfold or something in his pocket had been removed.
Pelham, Carroll, and the victim, Eugene L. Norris, had previously taken the train engines to Dothan Seed and Feed Company in Dothan, Houston County, Alabama, where they began switching cars. They had completed the switching and were proceeding East on the tracks with three engines pushing the approximately 22 train cars toward the Plant Street intersection. As they began to proceed engineer Norris blew the engine whistle. The section of track they were on had a 5 mile per hour speed limit. The train started out at a slow speed and all of a sudden began to increase speed. As they were approaching the Plant Street crossing Pelham attempted to give directions by radio to Norris to slow his speed. The train kept increasing speed and reached a speed of approximately 25-30 miles per hour. Pelham then threw an emergency switch at his and Carroll's end of the train causing the train to stop. Carroll and Pelham then ran back to the engine where they found Norris lying in the cab.
The victim's billfold was found by law enforcement officers behind Dothan Seed and Feed. Its contents were strewn. No money was present. A loaded shotgun shell was found between the tracks.
A witness had observed a black male walking toward the railroad track earlier that afternoon carrying a shotgun and identified him as Kenneth Earl Magwood. Magwood was thereafter located at Newsome's Drive-Inn in Dothan, Alabama, taken into custody, advised of his constitutional rights, and a shotgun shell was found on his person.
Magwood was subsequently questioned and gave a statement admitting to shooting Eugene L. Norris and taking his billfold. Magwood stated that he and Norris had been having some arguments concerning Magwood's being on the tracks. Magwood stated that he had taken the gun to shoot rabbits and that as he approached the engine he and Norris got into another argument. Magwood stated that Norris had called him a name, that he had gotten onto the engine, that they had gotten into a scuffle, and that the shotgun went off killing Norris. Magwood stated that he took Norris' billfold, jumped from the train, ran *Page 153 
down the tracks, and threw the billfold and shotgun away.
The next day Magwood was taken to the scene where he directed police officers to the shotgun. The shotgun was found to have one fired 12 gauge round in it.
An autopsy was performed on the body of Eugene L. Norris. A shotgun entrance wound was found on the left back side of the neck. Cause of death was a shotgun wound to the neck, with the path of the shot charge being mainly left to right, front to back, and slightly upward. The muzzle of the gun was approximately three to five feet from the victim at the time of the discharge.
The jury having found the Defendant so guilty, it is the finding of this Court that the Defendant, Kenneth Earl Magwood, intentionally killed Eugene L. Norris in the course of robbing Eugene L. Norris.
 FINDINGS OF FACT FROM THE SENTENCING HEARING
The Court considered the presentence report, the evidence offered by the State, and all the evidence offered by the Defendant including character witnesses and the testimony concerning the circumstances of his childhood.
The Defendant was given an opportunity to present any evidence he desired and was afforded a fair opportunity to rebut the State's evidence.
The Court makes the following findings of fact from the testimony and evidence presented at the sentencing hearing before the jury:
The Defendant, Kenneth Earl Magwood, was born on February 15, 1959, and at the time he intentionally killed Eugene L. Norris, was 23 years of age.
The Defendant was born illegitimate, never had a father in his home, and never knew his father. He lived with his grandmother from age 2 or 3 until he was approximately 14 years of age when his mother moved back to Alabama from New Jersey. At age 14 the Defendant went back and forth between his mother's and his grandmother's home until the age of 17. At the age of 17 the Defendant was sent to the penitentiary for three years for burglary and upon his release continued the same living arrangement with no set place to live. The Defendant while growing up had a speech impediment and was made fun of and was pushed around by other children because he could not communicate clearly. He was described as a slow learner in school.
The Defendant's financial circumstances were "very poor".
The Defendant's psychiatric evaluation revealed that he does not suffer from a mental disorder, but has an antisocial personality. His mental ability is one category above mild retardation.
The Defendant, in intentionally killing the train engineer while the train was in operation, knowingly created a great risk of death to many persons, and most particularly any person along or in the path of the train.
When the speed of the train, on the 5 mile per hour limit track increased to 25-30 miles per hour as a result of the shooting of its engineer, the train cars were rocking a good bit as the train was approaching the Plant Street crossing. Normally at the crossing a member of the train crew would get down and check before letting the train go on across. However, the train went through the crossing before sliding to a stop after Danny Pelham threw the emergency braking switch.
As a result of the train engineer's being shot and killed in the cab of the engine, there was a great risk that the runaway train could have derailed into houses, onto pedestrians, and could have hit automobiles at crossings. There were loose train cars sitting on the track across from the Plant Street crossing and 10-15 apartments in the vicinity where children and people are seen every day.
 AGGRAVATING CIRCUMSTANCES
The Court finds that the following aggravating circumstances exist in this case: *Page 154 
(1) The Defendant knowingly created a great risk of death to many persons.
(2) The capital offense was committed while the Defendant was engaged in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery.
 MITIGATING CIRCUMSTANCES
The Court finds the following mitigating circumstances to exist in this case:
(1) The age of the Defendant at the time of the crime (23).
(2) The Defendant was illegitimate, never knew his father, had never had a father figure in his home or any adult role model for fatherly guidance.
(3) The Defendant was to a large extent motherless except for his grandmother.
(4) The Defendant is of borderline intelligence, had a speech impediment, and had difficulty in school.
(5) The Defendant has no prior history of violence except for one incident resulting in an assault and battery conviction.
 CONCLUSION
The Court finds that either and particularly both of the aggravating circumstances outweigh the mitigating circumstances and that the aggravating circumstances are sufficient to support the death penalty.
It was on September 30, 1982, ordered, adjudged, and decreed by the Court that the warden of the William C. Holman Unit of the Alabama Prison System shall on January 7, 1982, within the walls of the said William C. Holman Unit of the Alabama Prison System, cause to pass through the body of the Defendant, Kenneth Earl Magwood, a current of electricity of sufficient intensity to cause the Defendant's death and to continue the application and intensity of such current through his body until he is dead.
Wherefore, it is hereby,
ORDERED, ADJUDGED, AND DECREED BY THE COURT that the sentence imposed by this Court on September 30, 1982, be carried out as previously ordered.
DONE this the 14th day of October, 1982.
 /s/ Ron Storey
RON STOREY, JUDGE 20TH JUDICIAL CIRCUIT OF ALABAMA